**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **LAURA JANE ROBINSON,** | ) | |
| | ) | **CIVIL ACTION** |
| | ) | |
| *Plaintiff,* | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **EXIST X., INC.,** | ) | |
| **901 N. Stuart Street** | ) | |
| **Suite 501** | ) | |
| **Arlington, VA 22203** | ) | |
| | ) | |
| **GALOIS, INC.,** | ) | |
| **421 SW 6th Avenue, Suite 300** | ) | |
| **Portland, OR 97204** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ROBERT WILTBANK, individually,** | ) | |
| **421 SW 6th Avenue** | ) | |
| **Suite 300** | ) | |
| **Portland, Oregon 97204** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

<u>**CIVIL ACTION COMPLAINT**</u>

Plaintiff Laura Jane Robinson, by and through her undersigned counsel, hereby avers as follows:

<u>**INTROUDCTION**</u>

1.    This action has been initiated by Plaintiff Laura Jane Robinson ("Plaintiff") against Defendants ExistX, Inc. ("ExistX"), Galois, Inc. ("Galois"), and Robert Wiltbank ("Wiltbank"), alleging violations of the False Claims Act, Whistleblower Protection Act, and Virginia statutory and

1

common law.[1]  As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.      This Court may properly maintain personal jurisdiction over Defendants because its contacts with Virginia and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co*. v. *Washington*, 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of Virginia.

## PARTIES

5.      Plaintiff is a woman over the age of 18, who was employed as the CEO of ExistX from September 11, 2023, until her unlawful termination on March 31, 2025.

---

[1] Plaintiff will move to amend her instant lawsuit to include claims under Title VII and the Virginia Human Rights Act and related retaliation claims once her administrative remedies are fully exhausted.  These claims are currently dual filed with the Equal Employment Opportunity Commission and the Virginia Division of Human Rights.

6.    Defendant ExistX is technology development and services company incorporated in Delaware and headquartered at 901 N Stuart St Ste 501, Arlington, VA, 22203. The corporation was created as an independent legal spinout entity of Galois, Inc. and its primary purpose was to commercialize Galois's developed research into real-world solutions for operational government users.

7.    Defendant Galois is ExistX's spinout sister company and is a privately held Oregon company, organized as an Employee Stock Ownership Plan (ESOP), and headquartered at 421 SW 6TH Ave Ste 300 Portland, OR, 97204. Defendant Galois is a minority shareholder, but exerts complete financial, operational and managerial control over ExistX.

8.    During the Plaintiff's tenure, Defendant Wiltbank served simultaneously as Chairman of ExistX's board and CEO and board member of Galois, maintaining individual control over both entities, and is currently CEO of both entities.

## FACTUAL BACKGROUND

### I.    PLAINTIFF AND DEFENDANTS EXISTX, GALOIS, AND WILTBANK

9.    Plaintiff is a seasoned female executive in the federal contracting space and was appointed CEO of ExistX, Inc. in September 2023.

10.    She holds a master's degree in electrical engineering from John Hopkins University (2004) and a bachelor's degree in electrical engineering from the University of North Carolina (May 2002).

11.    Plaintiff began working as an engineer in 1999 at the National Security Agency (NSA), working her way from a junior engineer to a senior engineer, and eventually a principal engineer before departing in 2006.

12.    Her work at NSA involved designing, building, and deploying technology solutions, giving her deep, hands-on experience in complex systems engineering.

13.     Plaintiff's early career not only cultivated advanced technical expertise but also provided direct insight into the operational priorities, security frameworks, and program processes of the federal government.

14.     In 2006, Plaintiff joined Booz Allen Hamilton as a technical lead and, over the course of more than a decade, steadily advanced from individual contributor to business leader.

15.     She proactively rotated through roles in engineering, task leadership, program management, and business development, working across the company's classified government business sectors and strategic innovations group.

16.     Through this progression, she built deep expertise in federal contracting, mission-aligned technology development, and regulatory compliance frameworks critical to running businesses supporting federal government programs. She developed a strong reputation for bridging technical expertise and business strategy to support mission-critical government programs.

17.     From 2016 to 2017, Plaintiff worked at Amazon, serving as a technical program manager at Amazon Web Services where she focused on integrating security analytics into day-to-day security operations.

18.     In 2017, Plaintiff moved to Oracle to take a director role within the military and intelligence consulting business with Oracle's national security group. She formed a high-performing business development team that resulted in multiple sole-sourced, net new contracts culminating in a 25% increase in revenue for her business line.

19.     In 2019 Plaintiff left Oracle and took an opportunity as a Senior Director with Hughes Network Systems where she successfully developed and implemented revenue-expanding strategies resulting in a 47% revenue expansion of the Hughes Defense and Intelligence business unit.

20.     Her strategic initiatives included rebranding federal offerings, facilitating dual-use

4

technology transition, and optimizing capture strategies across DoD accounts.

21.    In 2020, Plaintiff moved to ViaSat as a Vice President and executive leader tasked with growing key technology ventures and business strategies for the future.

22.    Seeking to apply her expertise in a more agile and innovation-focused environment, Plaintiff made a deliberate career shift from large defense contractors to the startup and early-stage technology space.

23.    In 2021, Plaintiff was recruited and hired as the Head of Government for Descartes Labs (DL), a commercial geospatial and analytics company.

24.    This role marked Plaintiff's first foray into bridging emerging commercial technology with federal mission applications and developing and leading a business.

25.    Shortly after her hire, Plaintiff played a foundational role in establishing Descartes Labs Government (DLG), a wholly owned subsidiary of DL.

26.    She served as a corporate officer and was part of the original leadership team responsible for structuring DLG to satisfy the security, compliance, intellectual property (IP) licensing, and federal contracting requirements necessary to legally resell and license DL's commercial technology to the U.S. federal government, requirements that the parent company, as a purely commercial entity, could not independently meet.

27.    Under Plaintiff's leadership and strategic direction, DLG quickly matured into a successful government-facing business unit, ultimately generating more than 50% of the parent company's revenue.

28.    Plaintiff's accomplishments creating and leading DLG to flourish, particularly her track record in securing IP licenses for federally funded technologies and navigating SBIR, FAR, and DFARS compliance, led to her recruitment by Galois and eventual hiring as ExistX's CEO.

29.    On or about September 11, 2023, ExistX, Inc. tendered a formal offer of employment to

Plaintiff for the role of Chief Executive Officer.

30.    The offer letter was not a preliminary negotiation or tentative proposal; rather, it laid out comprehensive and definitive terms of employment, including (1) an annual base salary of $260,000, (2) eligibility for an annual performance-based incentive bonus of up to $50,000 in 2024 and $100,000 in 2025 and subsequent years, (3) a grant of 700,000 shares of company stock (representing 7% equity), subject to clearly defined vesting milestones tied to performance metrics, and (4) a broad range of employee benefits, including employer-paid health, dental, and vision insurance for Plaintiff and her dependents, 401(k) matching contributions, paid time off, and disability and life insurance coverage.

31.    The letter also explicitly confirmed Plaintiff's entitlement to a seat on the company's board of directors with full voting rights during her tenure as CEO.

32.    The letter specified that Plaintiff would be required to sign a Proprietary Information and Inventions Assignment Agreement (PIIA) as a condition of employment, further evidencing the parties' intent to form a binding employment relationship governed by specific obligations.

33.    Plaintiff executed the letter on September 12, 2023, thereby affirming her acceptance of all material terms without modification.

34.    The letter was also signed by the company's Chairman, Robert Wiltbank, demonstrating mutual assent. No language in the agreement indicated that it was non-binding or contingent on further negotiation.

35.    Although the agreement stated that Plaintiff's employment would be "at-will," such a clause merely governed the duration and terminability of employment, not the enforceability of the parties' agreed-upon terms.

36.    Under both Virginia and federal law, the offer letter constitutes a valid and binding employment contract, supported by mutual assent, clearly articulated consideration, and a mutual

intent to be bound. Plaintiff began performing duties in reliance on the agreed terms, further reinforcing the contractual nature of the relationship.

37.     Upon signing the agreement, Plaintiff became CEO and board member of ExistX with a base salary of $260,000, a potential annual bonus of $50,000 for FY2024, increasing to $100,000 annually thereafter, and 700,000 shares of ExistX stock that were to vest based on specified milestones.

38.     ExistX, Inc. is a Delaware C-Corporation, independently incorporated on June 20, 2023.

39.     ExistX was created to serve as a technology transition engine, transforming advanced research and early-stage prototypes into deployable, revenue-generating solutions for mission-driven federal organizations beyond the traditional research and development community.

40.     Unlike its research-focused sister company, Galois, ExistX was intentionally structured as a more traditional, operations-oriented company capable of managing multidisciplinary teams and delivering technology solutions directly to end user government operators.

41.     ExistX end user operational customer focus required it to be structured for government regulatory compliance, including but not limited to, the Federal Acquisition Regulation (FAR), Defense Federal Acquisition Regulation Supplement (DFARS), 32 C.F.R. Part 117 ("National Industrial Security Program Operating Manual" or NISPOM), and Cybersecurity Maturity Model Certification (CMMC) Program.

42.     This compliance posture was essential for ExistX to propose for, be awarded, and execute contracts with U.S. government entities, including contracts involving classified work, and distinguished it from Galois, which is not structured to meet these requirements with ease.

43.     In addition to her role as CEO, Plaintiff was formally appointed by the ExistX Board to serve as the company's Senior Management Official (SMO), Facility Security Officer (FSO), and Insider Threat Program Senior Official (ITPSO).

44.    These roles are required under the Defense Counterintelligence and Security Agency (DCSA) regulations governing access to classified information and contractor facility clearance. Each role carried distinct legal responsibilities, and Plaintiff's mismanagement of security protocols, whether intentional or negligent, could have resulted in revocation of the company's Facility Clearance, debarment from federal contracting, or loss of her personal security clearance.

45.    In more egregious circumstances, such lapses may trigger civil or criminal penalties.

46.    In her capacity as ExistX FSO, SMO and ITPSO, Plaintiff was in a position of direct legal accountability to the U.S. Government.

47.    This heightened level of personal responsibility meant that failure to comply could result not only in corporate penalties, but also personal consequences for Plaintiff, reinforcing her obligation to raise and resist conduct she reasonably believed could violate federal law, including the False Claims Act.

48.    In January 2024, Plaintiff led the transition of ExistX's IT system from Google Workspace to a Microsoft 365 environment compliant with CMMC and NISPOM requirements.

49.    The upgrade introduced access controls and audit trails necessary for handling Controlled Unclassified Information (CUI), underscoring Plaintiff's commitment to federal security obligations.

50.    This change also marked the first time Defendant Wiltbank expressed clear dissatisfaction with her leadership, as the change brought restricted calendar sharing and limited system access for non-ExistX personnel, including Galois staff, curtailing his own visibility.

51.    His reaction foreshadowed broader resistance to Plaintiff's efforts to enforce lawful separation and compliance between the two entities.

52.    Wiltbank's response was not a mere policy disagreement but marked the beginning of a sustained pattern of resistance to Plaintiff's efforts to meet her legal obligations under federal

security regulations.

53.    The cornerstone of ExistX's business model is its unique, applied engineering technology solution, developed for end-user operational needs and initially enabled by its access to the extensive body of research intellectual property (IP) created by Galois over the past 25 years.

54.    While ExistX's initial focus, to get the business off the ground, was on operationalizing Galois's research for federal mission customers, its model was designed to extend to other Galois-like companies and mission-relevant startups, serving as a compliance-ready bridge between innovative research outputs and federal contracting opportunities.

55.    Galois holds a 49.25% equity stake (pre-dilution) in ExistX which ensured the company had a vested financial interest in the commercialization of its research portfolio.

56.    Despite being formed as an independent corporation, ExistX's governance and operations were deeply entangled with Galois.

57.    Other than the Plaintiff, the Board of Directors for ExistX lacked independence from Galois and had a total of 3 members: Plaintiff; Defendant Robert Wiltbank (CEO of Galois and member of the Galois board of directors, and ExistX board chairman); and Dr. John Launchbury (Co-Founder and CTO of Galois, Galois board member, the largest individual shareholder of ExistX, and ExistX board member).

58.    Following receipt of outside investment from Hale Capital Partners, Inc. (HCP) into ExistX (due to Plaintiff's efforts), this pattern of overlapping control continued and deepened.

59.    The Board expanded to include three representatives of HCP, two as voting Board Members (one held by HCP employee Nate Foos, the other initially vacant) and one as a Board Observer (Marty Hale, HCP's CEO).

60.    Although the investment introduced outside capital intended to accelerate ExistX's growth and operating independence, it instead reinforced pre-existing entanglements within the Galois

ecosystem.

61.    HCP not only holds a seat on Galois' Board of Directors, but is also financially invested in each of Galois's active spin-out companies, including Tangram Flex, Inc., Niobium Microsystems, Inc., and That Dot, Inc., and holds board seats on at least Tangram Flex and ThatDot, further entrenching HCP's influence across the entire Galois portfolio and blurring the boundaries of governance independence at ExistX.

62.    Accordingly, all voting members of the board, other than Plaintiff, were either current Galois executives, Galois board members, or had financial stakes with Galois through other Spin-Off companies.

63.    As a result, Plaintiff was the only independent voice on the Board and the only director not beholden to Galois or Galois' investment interests.

64.    In addition to fiduciary governance conflicts, there were significant conflict of interest issues, including the fact that individuals held positions of authority within both companies.

65.    For example, Dan Boyer simultaneously serves as Chief Financial Officer (CFO) of both Galois and ExistX, while also serving as Corporate Secretary for both companies' boards.

66.    This is not a nominal overlap; it placed the same individual in ultimate control of financial systems, cost allocation decisions, and contractual representations for both a prime contractor and its subcontractor.

67.    These dual roles create a fundamental conflict of interest, especially given the companies' prime/subcontractor relationships. Under federal contracting rules, this type of arrangement can violate organizational conflict of interest (OCI) prohibitions outlined in FAR Subpart 9.5, which require contractors to be organizationally independent and protect against undue influence or access to competitively sensitive information.

68.    This structure also facilitates coordinated decision-making that can obscure or distort

billing transparency, subcontract disclosures, or cost representations.

69.    In classified contracting, it further raised compliance concerns under NISPOM (32 C.F.R. Part 117), which mandates safeguards against influence that could compromise security controls. It may also violate DFARS 252.204-7012 and CMMC requirements by undermining the necessary segregation of access to Controlled Unclassified Information (CUI) between entities.

70.    When executives control both sides of a contract with no arm's-length separation, courts may pierce the corporate veil and hold both entities jointly liable for contractual breaches, mischarging, or False Claims Act violations.

71.    To Plaintiff's knowledge, no shared services agreement exists and, there is no formal separation of operational functions between the companies' operations.

72.    Plaintiff's refusal to submit proposals without a formal IP license was itself protected activity under the FCA and was also an effort to ensure compliance with SBIR, FAR, DFARS, OTA, and NISPOM obligations applicable to all clearance holders.

73.    Under §§ 117.7(b)(2) and 117.8(b)(1), contractors must adhere to all applicable federal regulations and contractual terms and avoid any action that could place the company in violation. Clearance holders, under the DoD Adjudicative Guidelines (Guideline E), are required to maintain the highest standards of honesty, integrity, and reliability.

74.    Knowingly submitting false, misleading, or noncompliant proposals could trigger insider threat reporting obligations under § 117.10(d) and call into question the suitability of the company and its personnel to hold security clearances.

75.    Defendants nevertheless pressured Plaintiff to take such actions, with Wiltbank stating in recorded calls that compliance should not be "overly legalistic," that contractual and statutory requirements were "gray areas" open to interpretation, and that one could "absolutely…have persuasive conversations with things that you don't own."

76.    These admissions underscore that Defendants were fully aware Plaintiff's refusal was grounded in mandatory compliance obligations, and that their retaliation targeted her for upholding the very trustworthiness required to perform classified work.

77.    Galois's finance and accounting department maintains unfettered control of and access to all of ExistX's financial systems, including payroll, accounts payable, and expense approvals. Galois personnel - who are not employees of ExistX - routinely manage and process financial activities on behalf of ExistX without oversight or authority from ExistX leadership.

78.    Despite being CEO, Plaintiff was denied signatory authority over ExistX's bank accounts. All financial direction, labor cost allocation, and invoice structuring flowed exclusively from Galois leadership, particularly Defendant Wiltbank and CFO Boyer.

79.    This structure rendered ExistX financially and operationally subordinate to Galois, contradicting federal acquisition requirements for contractor independence.

80.    This limitation also crippled ExistX's ability to credibly manage government contracts that require autonomy, security compliance, and clear internal firewalls.

81.    At all relevant times, Defendant Wiltbank served as SMO for Galois, Inc., the individual with ultimate authority over that company's classified operations and security program under the NISPOM, 32 C.F.R. § 117.7(b)(2). In that capacity, he was required to annually certify to DCSA his understanding of NISPOM requirements - including those governing cybersecurity, insider threat, and safeguarding of classified information - and to complete mandatory refresher training as a condition for Galois to maintain its entity facility clearance.

82.    This position carries a non-delegable duty to ensure ongoing compliance and to prevent any action that would place the company in violation of federal security regulations. As with all clearance holders, the SMO must uphold a heightened standard of ethics and integrity to maintain clearance eligibility, but the SMO role is uniquely critical because it sets the organization's compliance culture

and accountability tone; without a qualified and compliant SMO, a company cannot hold an entity facility clearance.

83.     Wiltbank had these same obligations at Galois as Plaintiff did in her SMO role for ExistX, and knew, or should have known, that the actions he was pressuring Plaintiff to take would place ExistX in violation of federal security regulations and contract requirements.

84.     In practice, ExistX's financial and operational activities were directed by the same leadership managing Galois, eliminating any real corporate separation. That, in turn, exposed both companies to regulatory risk and veil-piercing liability.

85.     Courts and regulators assessing corporate separateness in the federal contracting context look to whether two affiliated entities maintain genuine independence in governance, operations, and finances.

86.     Where the same executives exercise ultimate decision-making authority over both a prime contractor and its subcontractor, the risk of treating them as a single enterprise increases.

87.     The doctrine of "piercing the corporate veil" applies when: (1) there is unity of interest and ownership such that separateness no longer exists, and (2) respecting that fiction would promote fraud or injustice.

88.     Galois and ExistX shared top financial and operational leadership. Boyer served as CFO and Corporate Secretary for both, controlling payroll, accounting, and cost allocations.

89.     Wiltbank, CEO of Galois and Chairman of the ExistX Board, exercised de facto authority over ExistX, including blocking Plaintiff from directing financial operations or accessing accounts.

90.     No shared services agreement or firewall existed, and Galois personnel routinely performed core functions for ExistX with no formal authority. In these circumstances, courts have found veil piercing appropriate, particularly where the arrangement enabled FCA violations, unauthorized subcontracting, or cost misrepresentation. *See United States ex rel. Siewick v. Jamieson,* 214 F.3d

1372 (D.C. Cir. 2000); *Laborers' Pension Fund v. Lay-Com*, 580 F.3d 602 (7th Cir. 2009); *Adams v. Aurora Flight Sciences*, 2013 WL 12250686 (E.D. Va.); *United States v. Toyobo*, 811 F. Supp. 2d 37 (D.D.C. 2011).

91.    The operational and financial control exercised by Galois over ExistX exemplifies the "unity of interest" required for veil piercing. Courts applying this doctrine in government contracts frequently do so where a lack of separation enables mischarging, improper subcontracting, or concealment of non-compliance. Here, it destroyed ExistX's credibility as an independent subcontractor and exposed both entities to joint FCA liability.

92.    Galois's control extended to legal operations, further eroding ExistX's independence.

93.    Courts have also examined whether one entity dictates the legal strategy of another.

94.    At ExistX, legal control was centralized under Galois's General Counsel, Jodee LeRoux, who also *acted* as legal counsel for ExistX without holding a W-2 employment position, an executed consulting agreement, or any formalized retainer relationship with ExistX – at least none that Plaintiff was aware of.

95.    Despite her involvement in sensitive matters, LeRoux owed no documented duty of loyalty to ExistX. She advised ExistX leadership on issues involving Galois interests – including IP licensing, employment, and compliance – without a formal firewall.

96.    This dual representation undermined attorney-client privilege and compromised federal compliance with FAR 52.203-13 and the Procurement Integrity Act. Her dual role further demonstrates the lack of governance separation between the two companies.

97.    Dan Boyer also blurred legal and financial lines.

98.    Though not holding a legal role at ExistX, he routinely gave "legal" advice to Plaintiff and others. As a barred attorney in Oregon and CFO of both companies, Boyer's guidance was often accepted in good faith, despite a clear conflict of interest.

99.    His dual role gave Galois operational control over ExistX's legal and financial posture, without safeguards or independence. This structure facilitated decisions favoring Galois and increased the risk of regulatory violations, including under the False Claims Act.

100.    The absence of truly independent legal representation, whether through Galois's General Counsel or through conflicted advice from Boyer, had consequences far beyond the mishandling of IP licensing.

101.    This structure left ExistX unable to assert its corporate rights, negotiate independently with Galois, or assess legal risk without interference.

102.    Strategic and legal decisions were filtered through individuals whose loyalties were divided and often aligned with Galois.

103.    This compromised ExistX's ability to comply with ethical, regulatory, and contractual obligations as a federal contractor. It weakened the firewalls and independence required to avoid organizational conflicts of interest under FAR Subpart 9.5, created concurrent-representation issues under ABA Model Rule 1.7, and violated basic fiduciary duties owed to the corporation. This environment of blurred roles and conflicted leadership placed ExistX, and its federal contracts, at heightened legal and operational risk, further supporting the conclusion that the corporate veil between Galois and ExistX had been effectively pierced.

104.    Despite the structural and governance issues outlined above, many of which were not fully apparent to Plaintiff at the time, she accepted the role of CEO in good faith, with the belief that she was leading a legally and operationally independent entity.

105.    Her recruitment was based in part on Galois's stated goal of operationalizing its research through ExistX, including technologies like 5STARS, and of executing formal IP licenses to support that effort.

106.    ExistX was the ninth Galois spinout, and Plaintiff was brought in three to four months after

its incorporation. Galois leadership emphasized their "proven spinout formula" and that ExistX had followed the same blueprint as Tangram Flex, Inc., Niobium Microsystems, Inc., and ThatDot, Inc..

107.    It was standard practice for CEOs of these companies to operate out of Galois's offices, reinforcing the impression of a mature and replicable model. Given these representations and ExistX's early-stage status, Plaintiff had no reason to question the corporate structure or the involvement of Galois personnel. Acting in good faith, she led ExistX through its initial ramp-up and mission execution.

108.    In approximately November 2023, Galois resisted formalizing the IP licensing agreement between the companies, a step Plaintiff reasonably believed was foundational for any entity intending to use another company's technology in federal contracting.

109.    Although this raised concerns, Plaintiff initially attributed the resistance to a lack of familiarity with federal compliance norms and believed her expertise could help bridge the gap. Under her leadership, ExistX became revenue-positive in its first full fiscal year and secured critical client relationships, laying the foundation for long-term growth.

110.    As discussed above, Plaintiff was recruited for her demonstrated success in launching government focused businesses – notably, her work at Descartes Labs Government (DLG). She achieved similar results at ExistX. The early success of ExistX mirrored the trajectory of other Galois spinouts, further reinforcing Plaintiff's belief that ExistX was on a legitimate, sustainable path as an independent company.

111.    At the end of May 2024, Plaintiff secured the ExistX's security clearance, under the National Industrial Security Program Operating Manual (NISPOM), 32 C.F.R. Part 117, a key federal compliance milestone. Achieving this required demonstrating that ExistX maintained appropriate security protocols, personnel clearances, and governance structures to protect classified

information.

112.    As ExistX's FSO, Plaintiff personally certified to the DCSA that ExistX operated with the independence and safeguards required of a cleared contractor.

113.    This reinforced her belief that ExistX met the operational and compliance standards expected under federal law. With this clearance, ExistX became eligible for classified contracts and could begin hiring cleared personnel, positioning it for continued mission growth.

114.    Less than a week after securing ExistX's facility clearance, in early June 2024, ExistX was awarded their largest government contract to date, a $2 million award.

115.    This positioned the company for financial success in its first year and validated the government's confidence in ExistX's compliance, independence, and security posture.

116.    Building on this success, Plaintiff led a successful $3 million capital raise from a private equity firm on December 30, 2024, increasing ExistX's valuation to $12 million. This funding round further demonstrated investor confidence in her strategic direction and ability to mature the company into a high-value federal contractor.

117.    Despite these measurable achievements, Plaintiff was subjected to discriminatory treatment by Defendant Wiltbank throughout her tenure. His dual role as CEO of Galois and Chairman of ExistX's Board gave him outsized control over Plaintiff's decisions and the ability to interfere with her leadership under the guise of board oversight.

118.    Defendant Wiltbank regularly criticized her hiring decisions, particularly when they involved qualified women, and made demeaning gender-based remarks that reflected clear bias.

119.    For example, during the VP Operations/COO recruitment process, Defendant Wiltbank remarked: "Are you sure? You know what happens when lots of women work together."

120.    When Plaintiff selected a female candidate as Director of Business Development, Defendant Wiltbank dismissed the decision as "opportunistic" and warned, "you're hiring a lot of

women."

121.    He also expressed concerns that clients would "not want to work with all women," implying women leaders were less credible in the eyes of customers, and repeatedly insisted that male Galois employees vet ExistX female or technical hires, undermining Plaintiff's judgment despite her extensive engineering and leadership credentials.

122.    These directives delayed hiring decisions and signaled to internal and external stakeholders that her authority required validation by men affiliated with Galois.

123.    Motivated by his gender-animus, Defendant Wiltbank repeatedly undermined Plaintiff's credibility in meetings with employees of Galois and ExistX – that Plaintiff is aware of and can prove.

124.    His behavior publicly eroded her credibility, cast doubt on her leadership, and had potential to damage ExistX's standing in a tight knit cleared contracting community.

125.    This pattern of gender-biased conduct, paired with his increasing resistance to Plaintiff's compliance efforts, directly undermined her ability to perform her duties as CEO and created a hostile work environment.

126.    By repeatedly questioning her judgment in hiring, diminishing her credibility in front of staff and imposing additional scrutiny on her decisions that was not applied to male executives, Defendant Wiltbank materially interfered with Plaintiff's leadership authority.

127.    His gender-based dismissal of her expertise extended beyond personnel decisions to core compliance issues, including her repeated insistence that ExistX formalize intellectual property licensing agreements before pursuing business development involving Galois technologies. Instead of recognizing these compliance concerns, Wiltbank dismissed her as "too risk-averse" or "overprotective" of IP.

128.    Plaintiff's refusal to engage in business development activities involving technologies for

which ExistX lacked clear legal rights constituted protected activity under the False Claims Act's anti-retaliation provisions.

129.    These refusals, paired with the ongoing governance constraints described above, left Plaintiff in an untenable position: she could not lead the company without either compromising federal compliance or acquiescing to discriminatory interference.

130.    Her commitment to lawful conduct, and the resulting strain on her working conditions, was a substantial factor in Defendant Wiltbank's decision to terminate her.

131.    In January 2025, following months of escalating tension arising from Plaintiff's refusal to pursue business that utilized unlicensed Galois technologies, and despite outperforming every objective business metric, meeting the terms of her employment agreement, and prior representations by Defendant Wiltbank that she had earned more than her contracted $50,000 bonus, Plaintiff was ultimately awarded only $30,000.

132.    When Plaintiff questioned the shortfall, Wiltbank accused her of lacking "organizational leadership" and dismissed the agreement as nonbinding, stating it was "just an offer letter."

133.    This abrupt reversal of a clear contractual obligation underscored his broader pattern of undermining Plaintiff's rights and retaliating when she resisted engaging in conduct she reasonably believed would violate federal law.

134.    This assertion is inconsistent with both the language of the agreement and the conduct of the parties. Courts do not rely solely on a party's post hoc characterization of a document but instead assess the totality of the circumstances, including the specificity of the terms, mutual signatures, Plaintiff's acceptance and reliance, and the clear expression of intent to form a contractual relationship.

135.    Here, the agreement was clearly intended to be final and binding, signed by both parties, and relied upon by Plaintiff in good faith when she accepted the position.

136.    Accordingly, Defendant Wiltbank's attempt to recast the agreement as an "offer letter" does not render it unenforceable, particularly where it includes all the hallmarks of a binding employment contract and where his refusal to honor its terms temporally and causally connected to Plaintiff's protected compliance activity.

137.    In sum, Defendant Wiltbank's conduct, enabled by Galois's overarching control structure, constituted a sustained pattern of retaliation against Plaintiff for engaging in protected activity under the False Claims Act.

138.    From the moment she refused to submit proposals involving unlicensed technologies, Plaintiff faced escalating scrutiny, public undermining, gender-based dismissal of her authority, interference with her contractual entitlements, and eventual termination.

139.    The same control mechanisms that eroded ExistX's independence allowed Wiltbank to suppress her compliance concerns, retaliate for protected refusals, and obstruct her leadership.

140.    These were not isolated disputes; they formed a coordinated retaliatory campaign against a CEO attempting to uphold federal law, protect government resources, and prevent potential violations of the False Claims Act. Plaintiff's protected activities, including her refusals to proceed without clear legal rights and her insistence on structural compliance, were a substantial factor in her termination.

## II.    INTELLECTUAL PROPERTY LICENSING AGREEMENT WITH GALOIS

141.    Before a contractor may offer, propose, or deliver technology to the federal government, it must hold the legal rights to use that technology—either through ownership or a valid, written license.

142.    This requirement applies across procurement methods, including contracts subject to the Federal Acquisition Regulation (FAR), the Defense Federal Acquisition Regulation Supplement (DFARS), and non-FAR instruments such as Other Transaction Authority (OTA) agreements

under 10 U.S.C. § 4022.

143.    For technology developed under the Small Business Innovation Research (SBIR) program, 15 U.S.C. § 638 and the SBA's SBIR/STTR Policy Directive require the SBIR awardee to retain control of the technology, restrict licensing in ways that could compromise the government's rights, and ensure any third-party license preserves SBIR data rights protections.

144.    These protections are codified in standard SBIR data rights clauses, typically FAR 52.227-20 or DFARS 252.227-7018, which limit the government's rights to "government purpose rights" for a minimum of four years and require the SBIR data rights legend to be maintained. Improper licensing, misrepresenting rights in technical data, or bidding on work without the necessary license can result in loss of SBIR protections, forfeiture of rights to the government, contractual default, and liability under the False Claims Act, 31 U.S.C. § 3729.

145.    Securing government contracts was crucial to ExistX's success.

146.    Under federal law, an offeror may not represent that it has rights to technical data or computer software unless those rights are legally secured through ownership or a valid license. For technologies developed under federal funding, such as the majority of those developed by Galois, this requirement is governed by the Federal Acquisition Regulation (FAR), the Defense Federal Acquisition Regulation Supplement (DFARS), and where applicable, the Small Business Innovation Research (SBIR) statute, 15 U.S.C. § 638.

147.    For SBIR-funded technologies, the Small Business Administration's SBIR/STTR Policy Directive and the standard SBIR data rights clause (DFARS 252.227-7018 or FAR 52.227-20) require that the small business awardee retain control over the data, restricts licensing to third parties in ways that could compromise the government's rights, and mandates that any license clearly preserve the SBIR protections and comply with the government's purpose rights.

148.    In this case, ExistX was created in part to utilize Defendant Galois' technology in its

projects, and therefore, it was necessary to obtain IP licensing agreements between ExistX and Galois before seeking federal contracts that would use or build on Galois-owned technology.

149.    Accordingly, at the start of her employment in November of 2023, Plaintiff began working with Defendant Galois to obtain the IP licensing agreements between ExistX and Galois.

150.    These agreements were essential for ExistX to lawfully use and commercialize Galois-owned technologies, including "5STARS" (5G SDN Tools for Automated and Reliable Security), a software tool developed under multiple federally funded Small Business Innovation Research (SBIR) contracts sponsored by the United States Navy.

151.    As SBIR-funded technology, 5STARS was subject to heightened restrictions under the SBIR statute (15 U.S.C. § 638), the SBA Policy Directive, and its incorporated data rights clauses, including the SBIR Data Rights Legend requirements, the prohibition on transferring rights in a way that jeopardizes SBIR protections, and the obligation to maintain government-purpose rights without unauthorized encumbrances.

152.    Licensing SBIR-funded technology to a third party, such as ExistX, is permissible only if it preserves the awardee's control, protects the government's rights, and complies with the SBIR statute and implementing regulations.

153.    Failure to do so can result in loss of SBIR data rights protections for the small business, forfeiture of rights to the government, or exposure to liability under the False Claims Act (31 U.S.C. § 3729) for misrepresenting rights in technical data.

154.    To ensure that the small business recipient (in this case, Galois) maintains proper control of non-SBIR technologies, the same core licensing principles apply under FAR Part 27 and DFARS Part 227, and for Other Transaction Authority (OTA) agreements under 10 U.S.C. § 4022, the performer must have the legal rights to the technology offered, as outlined in the DoD OT Guide.

155.    Plaintiff acted in good faith so that any such licensing arrangement complied with SBIR regulations and federal acquisition rules, including DFARS 252.227-7018, FAR 52.227-20, and the OTA performer rights requirements, but was impeded by the lack of a structured licensing process and Galois's failure to formalize the necessary agreements.

156.    In January of 2024, ExistX's board (which consisted of all Galois employees who were also Board members) approved Plaintiff's IP strategy, having been informed by Plaintiff of the importance to the business of having formalized IP licensing agreements to legally contract and in good faith engage in formal federal proposals in compliance with the SBIR Policy Directive, DFARS 252.227-7018, FAR 52.227-20, and the DoD OT Guide requirement that performers possess documented legal rights to all technology proposed..

157.    Unfortunately, when it came to putting a licensing agreement into writing, Defendant Wiltbank refused.

158.    He repeatedly dismissed Plaintiff's concerns, insisting that she "not worry about the IP details" and continue pursuing federal contracts leveraging Galois-owned technology,  despite the absence of any formal agreement and despite knowing that proceeding without such an agreement would violate the SBIR Policy Directive, DFARS 252.227-7018, FAR 52.227-20, and the DoD OT Guide requirement that performers possess documented legal rights to all technology proposed.

159.    This position created significant legal and compliance risk for ExistX, which would have been representing to the federal government that it had rights it did not legally hold and could have subjected the company to liability under the False Claims Act, 31 U.S.C. § 3729.

160.    Galois General Counsel Jodee LeRoux, who was also acting as de facto counsel for ExistX, reinforced this position through inaction, declining to draft, negotiate, or advance a licensing agreement.

161.    Despite holding a dual advisory role, Ms. LeRoux failed to protect ExistX's interests.

162.    Her inaction further compounded the conflict of interest and left Plaintiff without independent legal support on a core compliance requirement.

163.    Plaintiff's insistence on legal and regulatory compliance provoked hostility from Defendant Wiltbank, who began a campaign of intimidation aimed at pressuring Plaintiff to abandon her position.

164.    This included personal emails and private conversations in which Wiltbank questioned Plaintiff's leadership, accused her of manipulating others to gain support, and demanded she defer to his authority, telling her she should "learn from" him rather than challenge him, a pattern of conduct directly triggered by Plaintiff's protected activity under the False Claims Act, 31 U.S.C. § 3730(h).

165.    In public forums within Galois, Defendant Wiltbank portrayed Plaintiff as being "grabby" with IP, intentionally calling her professional reputation into question and portraying her as not trustworthy for adhering to the SBIR licensing requirements, DFARS 252.227-7018, FAR 52.203-13, and OTA performer rights rules and refusing to submit proposals in violation of these mandates.

166.    These statements, made to technical staff whose cooperation was essential to licensing, were designed to undermine her authority and build a false narrative that would later be repeated post-termination.

167.    Throughout this period, Plaintiff continued to act in good faith, operating under the belief that appropriate licensing agreements would eventually be formalized, and that ExistX would be brought into full compliance with federal regulations.

168.    Plaintiff consistently maintained that formal IP agreements were required for ExistX to legally leverage Galois-owned technologies, particularly SBIR-funded technology like 5STARS, given the strict federal rules governing government use rights, IP control, and SBIR data

protections as set forth in 15 U.S.C. § 638, the SBIR/STTR Policy Directive, and DFARS 252.227-7018.

169.    In January of 2025, after more than a year of working with ExistX's board and Galois to obtain an IP licensing agreement between the entities, which would ensure that ExistX was legally permitted to formally bid on federal projects, it was decided that Galois would send a draft IP license agreement, that included 5STARS, to ExistX's board for review in order to meet the requirements of DFARS 252.227-7018, FAR Part 27, and the DoD OT Guide prior to proposal submission.

170.    In early February of 2025, Plaintiff and her team identified a qualified opportunity with a federal organization seeking to operationalize Galois SBIR technology, 5STARS.

171.    When Plaintiff exchanged emails with Galois principal scientist David Darais, the lead developer for 5STARS, regarding the federal customer's interest, he responded with enthusiasm and expressed full support for ExistX pursuing the opportunity.

172.    In fact, just weeks earlier, on January 7, 2025, Darais had emailed Plaintiff celebrating new development work on 5STARS and explicitly noting how those capabilities could be leveraged in the "5STARS + ExistX partnership," underscoring his support for ExistX's use of the technology.

173.    This concrete business opportunity reinforced the urgent need for a formal IP licensing agreement. Galois's positive response and encouragement gave Plaintiff no indication that they would refuse to execute an IP licensing agreement before submission, consistent with SBIR data rights protections and OTA performer eligibility rules.

174.    Unfortunately, despite this urgency, ExistX's Board continued to wait for a draft IP license agreement from Galois, leaving the company unable to lawfully proceed under FAR 52.227-20, DFARS 252.227-7018, or the OTA framework without misrepresentation of rights.

175.    On or around February 11, 2025, to fulfill her fiduciary duties as CEO and ensure legal

compliance, Plaintiff requested that Galois provide written documentation of its intent to execute an IP licensing agreement with ExistX.

176.    Through coordination with Galois General Counsel, Plaintiff obtained a signed memorandum dated February 14, 2025, stating that Galois was in the process of finalizing an IP licensing agreement with ExistX, including the 5STARS technology in accordance with the SBIR Policy Directive and DFARS 252.227-7018 requirements for third-party licenses.

177.    This memo, signed by Galois General Counsel Jodee LeRoux, explicitly committed to granting ExistX perpetual licenses for multiple Galois technologies, including 5STARS, and was presented as formal documentation that such licenses were in active legal review and would be finalized.

178.    On or about February 16, 2025, a federal agency formally notified Plaintiff that ExistX had been accepted onto a government-sponsored Other Transaction Authority (OTA) procurement mechanism.

179.    This acceptance was specifically based on the government's interest in operationalizing multiple Galois-developed technologies—including 5STARS—for mission-critical applications. Plaintiff immediately informed Galois of this significant opportunity and began preparing for the next step: submission of a formal project proposal under the OTA framework, a process that, under the DoD OT Guide, required documented rights to all proposed technology prior to submission.

180.    At that time, Plaintiff had in hand a signed Memo of Intent from Galois, outlining the mutual understanding that an IP licensing agreement would be executed to enable ExistX to use Galois technologies, including 5STARS, as well as an excited, supportive email from the associated 5STARS Galois Principal Scientist, David Darais.

181.    In a February 5, 2025 email, Darais told Plaintiff he was "definitely interested to pursue any/all of these 5STARS threads" with her, explicitly referring to the multiple potential projects

under the OTA ExistX anticipated an impending award, and offered to help with white paper drafting.

182.    This was a clear endorsement of ExistX's planned use of the technology that directly contradicted any suggestion that Plaintiff's work with 5STARS was unauthorized or problematic. Relying in good faith on these explicit commitments, including both a signed memo and direct encouragement from the 5STARS Principal Scientist, Plaintiff believed that Galois would promptly follow through with a formal license agreement to support the OTA opportunity in compliance with 15 U.S.C. § 638 and the OTA performer rights requirement.

183.    Without an executed license for 5STARS, Plaintiff could not ethically or legally submit a proposal to the OTA, as doing so would misrepresent ExistX's rights and potentially expose the company to regulatory or contractual violations under the SBIR Policy Directive, DFARS 252.227-7018, and the False Claims Act.

184.    Despite the urgency and value of the opportunity, Plaintiff prioritized compliance and did not herself or have her team draft a project proposal, ensuring they were acting transparently and responsibly in accordance with federal acquisition law and ethical standards, including the OTA requirement that performers possess documented legal rights to all technology proposed.

185.    On February 26, 2025, Galois still had not provided a draft IP license to the ExistX board.

186.    Instead, Defendant Wiltbank sent an email to the ExistX Board stating that he was "juggling a couple of engineer concerns" while assuring the Board that the draft IP licensing agreement would be sent to them for review by Friday, February 28, 2025, further delaying compliance with DFARS 252.227-7018, FAR Part 27, and the OTA rules.

187.    On February 28, 2025, the same day Defendant Wiltbank had assured the ExistX Board that the IP licensing agreement would be sent for review, Galois Principal Scientist David Darais sent an abrupt and unexpected email to Plaintiff rescinding all access to the 5STARS technology.

188.    In that email, sent in his capacity as the lead scientist representing 5STARS and Galois, Darais was explicit and unambiguous: ExistX was to "immediately cease and desist all proposal work, customer engagement, and external representation involving 5STARS," effective immediately.

189.    The directive covered all customer engagement, proposal development, and external representation, and was issued in mandatory terms, leaving no discretion for partial continuation of 5STARS activities. Under SBIR, FAR, and OTA rules, Plaintiff could not lawfully disregard such an instruction without misrepresenting ExistX's rights to the federal government.

190.    This action was both shocking and inexplicable given the months of collaborative work, prior approvals, and clear acknowledgment, by both Galois leadership and scientific staff, of ExistX's intended use of 5STARS as a core offering. Plaintiff's subsequent decision to halt all 5STARS-related activities was in direct compliance with this explicit directive and with SBIR, FAR, and OTA licensing requirements.

191.    Internal witnesses later confirmed that no licensing agreement existed at the time, that they "could not in good conscience pitch it" without one, and that Plaintiff's legal position was correct.

192.    The sudden reversal not only lacked justification but also came at a critical juncture, just as ExistX was preparing to submit a formal OTA project proposal involving 5STARS, and while DFARS 252.227-7018, FAR 52.227-20, and the OTA compliance framework still required a formal license prior to submission.

193.    Plaintiff, confused but acting in good faith, immediately complied with the cease-and-desist demand, halting all 5STARS-related activity.

194.    On March 1, 2025 (a Saturday), she notified the ExistX Board of the grave business and strategic risks created by Galois's abrupt withdrawal of access to 5STARS and called for an emergency board meeting on March 3, 2025 (a Monday).

195.    At the time, the decision appeared irrational and professionally damaging.

196.    The decision was part of a broader pattern, a strategic effort to undermine Plaintiff's leadership, discredit her insistence on legal and contractual compliance, and force her removal.

197.    Plaintiff's refusal to submit to Defendant Wiltbank's attempts to control ExistX, combined with her efforts to establish the company's independence, directly threatened Galois's ability to retain de facto control over its spinout.

198.    The rescission of 5STARS access was not a standalone decision; it was a calculated step in a larger campaign to pressure Plaintiff out of the company she was hired to lead for adhering to SBIR, FAR, and OTA licensing requirements.

199.    In the days leading up to the March 3, 2025 emergency ExistX Board meeting, email exchanges and internal discussions made clear that Defendant Wiltbank was not only aware of the decision to revoke 5STARS access, but that he was actively involved in orchestrating it. Word reached Plaintiff that in meetings with Galois personnel, Defendant Wiltbank had begun portraying her as "grabby" with respect to intellectual property.

200.    He allegedly told Galois scientists that Plaintiff was attempting to lock up 5STARS for ExistX in a way that would prevent them from commercializing it independently or spinning it out into a separate venture.

201.    These mischaracterizations appeared intended to sow fear and mistrust among technical staff, painting Plaintiff's efforts to secure proper IP licensing, as required for federal compliance, as a personal power grab rather than the legal and fiduciary duty of a responsible executive.

202.    Even before her removal, Defendant Wiltbank began misrepresenting Plaintiff's lawful insistence on licensing compliance as "grabbiness" over intellectual property, telling Galois technical staff that she was trying to "lock up" 5STARS for ExistX in a way that would prevent others from using it.

203.    He also suggested to staff that Plaintiff's approach was damaging Galois's ability to commercialize 5STARS independently, statements that ignored the SBIR and OTA licensing restrictions and her fiduciary duty as CEO. These false characterizations, made while Plaintiff was actively working to comply with SBIR, FAR, and OTA licensing requirements, were intended to erode her credibility inside both companies and laid the foundation for the post-termination defamation that followed.

204.    These tactics aligned with a broader strategy to marginalize Plaintiff by recasting her commitment to legal and contractual integrity as obstructionist behavior.

205.    Rather than address the compliance crisis caused by Galois's failure to license the technology, Defendant Wiltbank escalated his pressure campaign, condemning Plaintiff for halting 5STARS activities after Galois rescinded access, while continuing to push for ExistX to pursue federal proposals without a formal license.

206.    This placed Plaintiff in an untenable position: follow federal law and be cast as uncooperative, or submit to pressure and expose herself and the company to procurement fraud in violation of 31 U.S.C. § 3729, DFARS 252.227-7018, and OTA performer requirements.

207.    On March 3, 2025, at the emergency Board meeting, to address the unworkable situation created by Galois's 5STARS IP withdrawal, Plaintiff informed the Board of the substantial business implications of removing all 5STARS-related opportunities from ExistX's pipeline, and explicitly stated that she would not submit 5STARS, or any technology requiring an IP license, on any federal proposal without proper IP licensing, as doing so would expose ExistX to False Claims Act liability and violate the SBIR data rights legend requirements that preserve the government's rights.

208.    As CEO, Plaintiff emphasized her fiduciary duty to protect the company from federal law violations regardless of the business opportunity costs.

209.    During this time, Plaintiff provided the Board with legal memos outlining the federal legal risks associated with submitting a proposal without a valid IP license, particularly in light of SBIR protections and OTA proposal requirements under 10 U.S.C. § 4022 and the DoD OT Guide.

210.    Despite the urgency and Plaintiff's repeated requests, Galois had still not provided the Board with any draft IP license for review.

211.    From the emergency board meeting until on or around March 22, 2025, Defendant Wiltbank had multiple conversations with Plaintiff in which he dismissed her continued insistence on IP compliance as being "risk-averse to a fault."

212.    Despite the clear cease-and-desist directive from Galois's own Principal Scientist and the absence of any licensing agreement, Wiltbank continued to pressure Plaintiff to move forward with federal proposals leveraging 5STARS.

213.    Rather than supporting her efforts to obtain legal clarity or protect the company from regulatory risk, he increasingly excluded her from governance discussions and strategic decision-making.

214.    As this pressure mounted, Plaintiff began to believe she was being set up—deliberately placed in an untenable position where any decision could be used against her.

215.    Her refusal to act unlawfully was portrayed as obstructionist, while her compliance with Wiltbank's direction would have exposed her to personal and corporate liability for violations of 31 U.S.C. § 3729, DFARS 252.227-7018, and FAR 52.203-13.

216.    After fully realizing that she had no access to independent legal, operational, or board-level support, and that Galois General Counsel Jodee LeRoux was not acting in ExistX's interest, Plaintiff took steps to protect the company.

217.    Between March 10 and March 26, 2025, she actively sought to retain outside legal counsel for ExistX, conducting interviews with Williams Mullen, a firm with expertise in government

intellectual property and data rights.

218.    This was a necessary and prudent effort to restore legal independence and ensure compliance with federal regulations, including SBIR licensing restrictions, DFARS Part 227, and OTA performance rules. However, before Plaintiff could finalize the engagement, she was terminated, cutting off the only path to resolving the company's growing legal and structural exposure.

219.    On March 31, 2025, under the pretense of a rescheduled board meeting originally set for March 26, Plaintiff joined the meeting under the impression it would be a routine leadership discussion. Instead, she was met by Defendant Wiltbank, and ExistX Board Members Nate Foos, and Mary Hale—without prior notice or agenda—and was abruptly terminated. The stated reasons for her removal – "not a culture fit," "lack of trust," and "differences on IP" – were thinly veiled pretexts.

220.    In reality, Plaintiff was removed for refusing to violate federal law, for insisting on legal and structural independence for ExistX, for her efforts to end gender discrimination at ExistX and resist the gender discrimination she experiences, and for challenging Defendant Wiltbank's unchecked control in connection with her protected activity under 31 U.S.C. § 3730(h).

221.    Plaintiff's termination occurred just weeks after she continually refused to submit a federal government proposal involving 5STARS without an executed IP license—an act that would have violated federal law including SBIR licensing restrictions, DFARS 252.227-7018, and the OTA performer rights requirement, and less than two months after she objected to the improper withholding of her earned bonus.

222.    Her termination was not a business decision; it was retaliation for her refusal to break the law and her continued insistence on protecting ExistX from regulatory exposure.

223.    These events formed part of a deliberate and escalating campaign of retaliation in response

to Plaintiff's good-faith efforts to ensure legal compliance and prevent Defendant Wiltbank from using unlicensed technology in federal contracts.

224.    Knowing she would not compromise her ethics or legal responsibilities, Defendants intentionally withheld the IP license, manufactured a crisis, and used it to justify her removal in direct violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

225.    Less than 24 hours after Plaintiff's termination, Defendant Wiltbank—who had by then assumed the role of CEO at ExistX, began pressuring remaining business development personnel to submit a 5STARS-based proposal under the same OTA opportunity that Plaintiff had previously declined to pursue without a formal IP license.

226.    This renewed push came despite the fact that no licensing agreement was in place and followed months of Plaintiff's documented warnings that doing so would violate federal procurement laws, including SBIR data rights protections, DFARS 252.227-7018, and the OTA performer rights requirement.

227.    After encountering continued internal resistance, this time from ExistX staff who, like Plaintiff, recognized the legal risks, Defendants finally moved to create a licensing document in late April 2025. However, the resulting agreement excluded 5STARS, granted no specific use rights for SBIR technology, and contained a revocation clause allowing Galois to withdraw the license at any time.

228.    The license is materially insufficient for federal contracting and would not have been accepted by Plaintiff in her capacity as CEO, a fact Defendant Wiltbank clearly understood.

229.    Document version history from Galois's own system confirms that work on the license agreement stopped on February 19, 2025, two weeks before Plaintiff's termination, and did not resume until April 28, 2025, well after her removal, when the stripped-down, non-compliant version was created. This post-termination maneuver further confirms that Plaintiff's removal was

not about disagreement over IP strategy, but about eliminating the only executive who insisted on compliance with SBIR licensing requirements, FAR Part 27, DFARS Part 227, and OTA performance rules.

230.    The agreement leaves the company, even as of today, exposed to the same regulatory risks Plaintiff had spent months trying to prevent.

231.    The timing, substance, and inadequacy of the post-termination license agreement, along with Defendant Wiltbank's immediate return to pressuring employees to act without it, and the documented February 19, 2025 cessation of license work, underscore that Defendants knew an IP license was required all along. Plaintiff was terminated not because she misunderstood the law, but because she refused to break it – protected activity under the False Claims Act, 31 U.S.C. § 3730(h), the SBIR Policy Directive, and the OTA compliance framework.

232.    After her termination, Defendant Wiltbank made false and defamatory statements about Plaintiff to employees at both ExistX and Galois.

233.    He portrayed her as untrustworthy and stated that her termination was a result of her "handling" of IP issues, describing Plaintiff's insistence for an IP agreement as "grabby" and "overreaching," deliberately misrepresenting her principled stance as misconduct.

234.    In an April 17, 2025 leadership call, less than three weeks after Plaintiff's termination and six days after Defendants received Plaintiff's legal demand letter, Wiltbank told other executives that "Janie royally fucked up the response to 5STARS."

235.    This comment referred to Plaintiff's decision to halt all 5STARS activity following a February 28, 2025 email from Galois's Principal Scientist directing ExistX to "cease and desist all proposal work, customer engagement, and external representation" involving 5STARS until further notice.

236.    At the time, Plaintiff was acting in accordance with the February 14, 2025 licensing

memorandum signed by Galois General Counsel, which confirmed the license was in process and required for lawful use.

237.    This statement was false, as internal communications, including a February 14, 2025 signed memo of intent from Galois and contemporaneous emails from the 5STARS Principal Scientist, confirm that Plaintiff acted in accordance with federal licensing requirements.

238.    Multiple witnesses have confirmed this statement was made, and that it was delivered in a business context, to senior personnel, and with the intent to discredit Plaintiff's competence and integrity. The statement was made in a business setting, in front of senior staff, and was designed to damage Plaintiff's professional reputation and credibility.

239.    This false framing reinforced the same "lack of trust" narrative Defendants and aligned Galois staff had been using for months, demonstrating that the defamation was not isolated, but part of a sustained and coordinated effort to undermine her.

240.    Defendant Wiltbank's defamatory statements have caused lasting harm to Plaintiff's professional reputation, damaged her credibility in the federal contracting and technology communities, and deterred potential employers, inflicting long-term consequences that extend well beyond her wrongful termination.

241.    On April 28, 2025, during a leadership meeting, Wiltbank told employees, "I don't think we broke the law a single time with respect to 5STARS," despite internal acknowledgments from other executives that no license existed and that they "could not in good conscience pitch it" without one.

242.    These repeated statements contradicted the documented facts, mischaracterized Plaintiff's lawful refusal as misconduct, and were made with knowledge of their falsity or with reckless disregard for the truth and after Defendants had been placed on legal notice via Plaintiff's counsel.

### III.    HOSTILE WORK ENVIRONMENT

243.    In addition to the retaliation and defamation described above, Plaintiff was subjected to a hostile work environment for much of her tenure—one made possible by the total lack of corporate independence between ExistX and Galois. Despite being hired as CEO, Plaintiff was never given true authority to protect her team, enforce workplace standards, or act on employee complaints without interference or second-guessing from Defendant Wiltbank and other Galois employees. This lack of authority was not merely procedural, but also directly emboldened Galois employees, including individuals later tied to admitted sabotage of federal opportunities, to disregard Plaintiff's directives with impunity.

244.    Rob Wiltbank's communications also made clear that Plaintiff's authority was conditional upon his personal approval. In a November 19, 2024 email, he accused Plaintiff of being "territorial," faulted her for not seeing ExistX as part of "US, a tribe," and dismissed her email as a "polite blow off." He claimed she failed to ask "a single curious question," reinforcing his perception that she did not value his personal insights over ExistX's independence.

245.    Plaintiff's lawful and protective decisions as CEO were recast as insubordinate, reinforcing that she was expected to defer to Wiltbank regardless of the facts. These reprimands reinforced the broader pattern: Plaintiff was penalized not for misconduct, but for prioritizing the safety, professionalism, and legal compliance of the team she was hired to lead. Wiltbank's fixation on "trust" over professional conduct was used as a cudgel to undermine her authority and chill any challenge to his control.

246.    On June 25, 2024, the same Galois employee who was later tied to the Dayton office harassment and admitted interference with follow-on federal contracts to ExistX sent Plaintiff an email stating: "a path forward needs to begin with reestablishing trust on what sits on our plates now before we talk about growth… If we don't have trust… the growth piece does not matter."

247.    This mirrored the same "trust" language repeatedly used by Defendant Wiltbank to

challenge Plaintiff's leadership and reframe her legal and fiduciary obligations as signs of personal disloyalty. The email further confirms that, by mid-2024, there was a coordinated effort to condition ExistX's operational autonomy and growth on Plaintiff's deference to Galois control, rather than lawful performance or merit.

248.    The same individual later admitted to deliberately interfering with ExistX business opportunities (where Galois was the Prime and ExistX the sub), but his alignment with Galois leadership was apparent long before that. In June 2024, months before the contract sabotage, this employee emailed Plaintiff stating, "we have to start from trust," language that mirrored Defendant Wiltbank's own rhetoric when undermining her authority on compliance and IP licensing matters.

249.    This echoed phrasing reflected a coordinated posture against Plaintiff's efforts to assert ExistX's independence and comply with federal procurement requirements. This demonstrates that the "trust" narrative was not a spontaneous concern, but a sustained effort to frame Plaintiff's legal and fiduciary actions as problematic.

250.    In May 2024, Plaintiff's team reported repeated instances of harassment and inappropriate workplace behavior by Galois staff in the shared office space in Dayton, Ohio. Although Plaintiff immediately escalated these concerns to Galois management, the situation deteriorated rather than improved.

251.    By September 2024, the misconduct had escalated significantly, with employees reporting an increasingly hostile and toxic atmosphere. Plaintiff's attempts to raise these concerns were ignored or reframed as "lack of trust," part of a pattern in which any assertion of boundaries was characterized as combative.

252.    One Galois employee made demeaning gender-based comments about the physical appearance of a female ExistX employee and mocked her medically required dietary restrictions in front of others, stating that she was "too high maintenance to work with."

253.    The harassment was persistent and overt. ExistX employees became so uncomfortable that they began avoiding the shared office entirely, despite it being their designated workspace. The psychological safety of the team had degraded so severely that professional productivity was impacted.

254.    Plaintiff's Director of People Operations filed formal HR complaints to Galois and requested intervention from Galois leadership.

255.    However, Defendant Wiltbank and Galois management downplayed the allegations, failed to conduct a meaningful investigation, and refused to implement corrective measures, effectively condoning the harassment by inaction.

256.     In response to the escalating misconduct, Plaintiff secured a separate workspace to protect her team and barred the offending Galois employees from further interaction—effectively neutralizing the disruption. Rather than support this necessary action, Defendant Wiltbank reprimanded Plaintiff for acting "without approval," asserting control despite having failed to address the underlying misconduct.

257.    Plaintiff's efforts to enforce professional boundaries, including barring the primary offender from all ExistX business, were met with immediate retaliation by Galois leadership. Instead of supporting this reasonable and protective action, Defendant Wiltbank reprimanded Plaintiff and accused her of undermining trust. Defendant Witbank also engaged CFO Boyer to echo these criticisms, chastising Plaintiff for allegedly demonstrating a "lack of trust in involvement," a phrase used repeatedly to suggest disloyalty for refusing to include a known antagonist that works in a separate company, in ongoing ExistX business activities.

258.    After Plaintiff's termination, Defendant Wiltbank, now speaking as ExistX CEO in addition to Galois CEO, publicly dismissed the Dayton harassment and hostile work environment situation as a "misunderstanding" and that affected ExistX employees "overreacted" during a

company-wide meeting and reintroduced one of the Galois employees responsible for the misconduct back into the team, sending a clear signal that Galois prioritized control and loyalty over safety and accountability.

259.    This post-termination minimization further reinforced the message that complaints about misconduct would be ignored and those who raised them punished.

260.    The hostile culture was not limited to internal harassment, it extended to deliberate interference with ExistX's business operations.

261.    The Galois employee whom Plaintiff had formally excluded from all ExistX business activities due to credible business interference in ExistX follow-on work and harassment complaints was never disciplined by Galois.

262.    Despite being barred by Plaintiff from engaging with or participating in ExistX company operations, this individual was permitted and encouraged by Galois leadership to participate in joint meetings, influence federal capture efforts, and access sensitive business information.

263.    This undermining of formal boundaries placed the company and its contracts at legal risk and further eroded Plaintiff's ability to lead.

264.    In late 2024, this same individual admitted, both to Plaintiff and separately to the ExistX COO, that he, representing the Prime contractor, Galois, that ExistX was a subcontractor to, had intentionally blocked follow-on work with the Air Force Research Laboratory (AFRL), a move that directly harmed ExistX.

265.    Earlier, in June 2024, this individual had emailed Plaintiff stating, "we have to start from trust," language mirroring Defendant Wiltbank's own rhetoric when undermining Plaintiff's authority.

266.    This phrasing echoed the same manufactured "lack of trust" and "grabby with IP" narrative later used by Defendants in connection with the 5STARS licensing dispute, showing that the

campaign to cast Plaintiff as untrustworthy was coordinated months in advance. This act of sabotage resulted in the loss of a federal contract opportunity, forced the layoff of two employees, and significantly disrupted the company's growth trajectory.

267.    Defendant Wiltbank took no disciplinary action in response. Rather than support Plaintiff's decision to shield her team from a known source of harm, Defendant Wiltbank repeatedly chastised her for excluding the offending Galois employee. He accused Plaintiff of "creating division" and suggested that she, not the Galois employee who engaged in harassing behavior and admittedly interfered with ExistX's business, was to blame for the resulting tension. Notably, the employee in question was never an employee or part of ExistX.

268.    These actions, and the refusal to discipline the individual, reflected a broader refusal by Galois leadership to take harassment seriously and formed part of a sustained campaign to undermine Plaintiff's authority and remove her for exercising sound judgment, integrity, and legal responsibility. In Wiltbank's view, safety and compliance were subordinate to loyalty and alignment.

269.    Multiple witnesses reported that, in post-termination discussions with ExistX leaders, Defendant Wiltbank claimed that Plaintiff had "made" the Galois employee, the same individual credibly accused of harassment and later admitted to blocking federal contract work, "behave badly."

270.    This statement was both false and defamatory. It shifted responsibility for the misconduct away from the offending employee and onto Plaintiff, reinforcing the narrative that she was the source of disruption.

271.    By portraying Plaintiff as provoking or causing unprofessional conduct, Defendant Wiltbank not only excused the harasser's actions but also further damaged Plaintiff's reputation as a leader.

272.    This comment, made to senior personnel, was intended to undermine Plaintiff's credibility,

discourage others from supporting her account of events, and justify her removal despite her documented efforts to protect her team and maintain federal compliance.

273.    These events, when taken together with the denial of Plaintiff's earned bonus, her retaliatory firing for refusing to violate federal procurement law, her resistance to gender-based hiring interference, and the deliberate sabotage of her legal and operational independence – paint a consistent and deeply troubling picture of misconduct, retaliation, and systemic control.

274.    These actions also send a clear message to all ExistX employees that reporting harassment or supporting Plaintiff's compliance measures would not only be ignored but could invite retaliation, chilling further complaints and eroding workplace trust. The pattern was clear: Galois retained total control, and Plaintiff's authority existed only so long as she deferred to Defendant Wiltbank.

275.    Plaintiff was not terminated for poor performance.

276.    Under her leadership, ExistX became revenue-positive in its first full fiscal year and secured meaningful federal opportunities.

277.    She was removed because she refused to engage in unlawful conduct, challenged and opposed discriminatory and retaliatory behavior, and sought to restore legal and structural independence to the company she was hired to lead. Her success became a liability once it threatened Galois's informal control.

278.    The termination, coupled with defamatory post-employment comments and blacklisting in the tight-knit federal technology-contracting community, severely damaged her professional standing, irreparably harmed Plaintiff's reputation and impaired her ability to secure new opportunities, compounding the economic and emotional impact of her wrongful termination.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of The FALSE CLAIMS ACT RETALIATION (31 U.S.C. § 3730(h))**

279.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

280.    Under 31 U.S.C. § 3730(h), to establish a claim of retaliation under the False Claims Act (FCA), a plaintiff must demonstrate: (1) She engaged in protected activity aimed at investigating, preventing, or stopping a violation of the FCA; (2) her employer knew or should have known of her protected activity; and (3) she suffered an adverse employment action as a result of that activity. *See U.S. ex rel. Grant v. United Airlines*, *Inc.,* 912 F.3d 190, 200 (4th Cir. 2018).

281.    In this case, between November 2023 and March 2025, Plaintiff, as CEO of ExistX, consistently warned ExistX's Board of Directors—dominated by executives from parent company Galois, including Chairman Robert Wiltbank—of the serious legal risks associated with submitting a federal contract proposal without a formal intellectual property (IP) licensing agreement between ExistX and Galois.

282.    She specifically objected to submitting a proposal to the federal government regarding use of Galois's 5STARS technology absent such an agreement.

283.    On March 1, 2025, Plaintiff informed the Board that moving forward without an IP license could expose ExistX to liability under the FCA.

284.    On March 3, 2025, she convened an emergency board meeting to further warn of these consequences and shared legal memoranda outlining the risks. On March 10, 2025, Defendant Wiltbank dismissed her concerns as being "risk-averse to a fault" and excluded her from governance discussions.

285.    Less than three weeks later, on March 31, 2025, she was terminated.

286.    The sequence of events demonstrates that Plaintiff engaged in protected activity, that the company was aware of it, and that her termination was retaliatory.

287.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe financial, reputational, and emotional harm.

288.    Plaintiff requests for this claim, back pay, front pay, unpaid bonuses and benefits in an amount of no less than $500,000, compensatory damages for emotional distress and reputational harm of no less than $300,00, plus punitive damages pursuant to 31 U.S.C. § 3730(h) of not less than $500,000, and attorneys' fees and costs.

## COUNT II

### Violation of the Virginia Whistleblower Protection Act (Va. Code § 40.1-27.3)

289.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

290.    Under Va. Code § 40.1-27.3, a plaintiff must show: (1) A good faith report of a violation of federal or state law or regulation; (2) made to a supervisor or public body; and (3) retaliation in response to that report.

291.    Here, Plaintiff's efforts to prevent ExistX from submitting a non-compliant government contract were consistent, sustained, and communicated directly to top leadership at ExistX, including Defendant Wiltbank.

292.    These disclosures were rooted in legal obligations under federal procurement law and regulations, including the False Claims Act and SBIR data rights protections.

293.    In direct response, Plaintiff faced escalated hostility, exclusion from governance discussions, and termination.

294.    On March 31, 2025, Plaintiff was terminated.

295.    The timing and context of her firing underscore its retaliatory nature.

296.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe financial, reputational, and emotional harm.

297.   Plaintiff requests for this claim, back pay, front pay, and benefits in an amount of no less than $500,000, compensatory damages for emotional distress and reputational harm of no less than $300,00, plus punitive damages of not less than $500,000, and attorneys' fees and costs.

## COUNT III

### Violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d)

298.   Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

299.   To prevail under 29 U.S.C. § 206(d), a plaintiff must show: (1) she received lower compensation than male counterparts; (2) for substantially equal work; and (3) under similar conditions and with similar responsibilities.

300.   In January 2025, despite having met all performance goals and substantially increasing ExistX's revenue and valuation, Plaintiff received only a $30,000 bonus instead of the $50,000 she was contractually owed.

301.   Wiltbank explicitly dismissed her entitlement by claiming the contract was merely an "offer letter."

302.   The company's refusal to honor her performance bonus while treating male executives more favorably supports a prima facie case under the Equal Pay Act. Male executives within ExistX or Galois with similar responsibilities were not subject to arbitrary reinterpretation of their compensation agreements.

303.   Plaintiff met or exceeded all performance goals for FY2024 and was contractually entitled to a $50,000 bonus.

304.   Defendants, without justification, withheld $20,000 of her earned bonus, with Wiltbank dismissing the contract as "just an offer letter."

305.   Plaintiff requests for this claim, unpaid wages of no less than $20,000, liquidated damages

of $20,000, plus pre and post judgement interest, and attorney's fees and costs.

## COUNT IV

### Breach of Contract

306.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

307.    For a breach of contract claim a plaintiff must prove: (1) a valid contract existed; (2) the defendant breached that contract; and (3) the plaintiff suffered damages as a result.

308.    Plaintiff signed a written agreement on September 12, 2023, which specified Plaintiff's salary, bonus structure, stock options, benefits, and board seat.

309.    She fully performed her contractual obligations, including achieving revenue, compliance, and valuation milestones.

310.    Nevertheless, Defendants failed to pay the full performance bonus and denied the enforceability of the contract, causing significant financial harm.

311.    Plaintiff requests for this claim, the contractually obligated payment of her bonus in an amount of no less than $20,000, payment of $580,800 as a value of equity loss based on $12M post-raise valuation and 4.84% diluted stake (7% pre-dilution), and lost benefits and consequential damages in an amount of no less than $100,000, plus pre and post judgment interest, and attorney's fees and costs.

## COUNT V

### Common Law Defamation

312.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

313.    To prevail under Virginia defamation law, Plaintiff must establish: (1) the defendant published a false statement of fact; (2) about the plaintiff to a third party; (3) that was made

negligently or maliciously; and (4) that caused reputational or economic harm.

314.    Here, following Plaintiff's termination on March 31, 2025, Defendant Wiltbank told ExistX and Galois personnel that Plaintiff was "untrustworthy" and had mismanaged IP issues.

315.    Further, Defendant Wiltbank has continued to make defamatory comments about Plaintiff to others in the federal contracting community.

316.    These statements directly contradicted her documented efforts to secure legal compliance and were made with knowledge of their falsity.

317.    They were intended to and did in fact harm Plaintiff's professional standing, particularly in the small and reputation-sensitive federal contracting community.

318.    These statements were made to internal stakeholders and external business partners, causing irreparable damage to Plaintiff's professional reputation.

319.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe financial, reputational, and emotional harm.

320.    Plaintiff requests for this claim, compensatory damages in an amount of no less than $300,000 for emotional distress and reputational harm, consequential damages of not less than $500,000 as a result of the lost employment and business opportunities, and punitive damages of no less than $500,000 for malice and reckless disregard of the truth, plus attorney's fees and costs.

## COUNT VI

### Wrongful Termination in Violation of Public Policy (Bowman Claim)

321.    Plaintiff references and incorporates all factual allegations in the preceding paragraphs as if fully restated herein.

322.    Under Virginia law, an at-will employee may bring a common-law wrongful discharge claim where the termination violates a public policy explicitly expressed in a statute, constitutional provision, or regulation. See *Bowman* v. *State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797

(1985). A wrongful termination claim may arise when an employee is discharged for (1) exercising a statutorily created right, (2) refusing to engage in a criminal act, or (3) performing a statutorily imposed duty.

323.    The public policies at issue in this case are grounded in: **The federal False Claims Act** (31 U.S.C. § 3729 et seq.) and its anti-retaliation provision (31 U.S.C. § 3730(h)), which protect individuals who investigate, object to, or refuse to participate in **The Virginia Whistleblower Protection Act** (Va. Code § 40.1-27.3), which prohibits retaliation against employees for reporting, in good faith, violations of federal or state law; and conduct that would result in presenting false or fraudulent claims to the federal government; **Federal and state anti-discrimination protections** under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and the Virginia Human Rights Act (Va. Code § 2.2-3900 et seq.), which prohibit discrimination and retaliation based on sex.

324.    Plaintiff engaged in protected conduct under these statutes, including: Refusing to submit federal contract proposals involving Galois's 5STARS technology without an executed intellectual property license, as required by the SBIR Policy Directive, DFARS 252.227-7018, FAR Part 27, and OTA performer rules; Reporting and objecting to Defendants' attempts to proceed with proposals that would misrepresent ExistX's legal rights to technology, in violation of the FCA and federal procurement law; and Opposing and resisting Defendant Wiltbank's gender-based comments, hiring interference, and undermining of female employees, and taking steps to address a hostile work environment.

325.    Defendants, with knowledge of Plaintiff's protected conduct, terminated her employment on March 31, 2025, under pretextual reasons including "not a culture fit," "lack of trust," and "differences on IP," when the true reason was her refusal to violate the law, her good-faith reporting of potential violations, and her opposition to sex discrimination.

326.    Plaintiff's termination directly contravenes the clearly expressed public policies of the United States and the Commonwealth of Virginia, as embodied in the above-referenced statutes, and falls within the *Bowman* exceptions to the at-will doctrine.

327.    As a direct and proximate result of Defendants' wrongful termination, Plaintiff has suffered severe economic losses, reputational harm, loss of career opportunities, and emotional distress.

328.    Plaintiff demands judgment against Defendants, jointly and severally, for back pay, front pay, compensatory damages in an amount not less than $500,000, punitive damages of not less than $500,000, costs, pre- and post-judgment interest, and such further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter an Order providing for:

A.    Defendant to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, bonuses, stock options, pay increases, insurance, and benefits pursuant to the False Claims Act, Equal Pay Act, the Virginia Whistleblower Protection Act, breach of contract and defamation.

B.    Punitive damages and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C.    Other equitable and legal relief as the Court deems just, proper, and appropriate (including, but not limited to, damages for emotional distress, reputational damage, and pain and suffering).

D.    Costs and expenses of this action and reasonable attorney's fees as provided by applicable

federal and Virginia law.

E.  Pre- and post-judgment interest; and

F.  Plaintiff to be given a jury trial as demanded in the caption of the instant Complaint.

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial on claims so triable.


Respectfully submitted,


 /s/ Thomas J. Curcio
Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com


*Attorneys for Plaintiff*