THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| LAURA JANE ROBINSON, | ) | |
| | ) | CIVIL ACTION |
| | ) | |
| *Plaintiff,* | ) | Case No. 1:25-cv-01524-RDA-LRV |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| EXIST X., INC., | ) | |
| 901 N. Stuart Street | ) | |
| Suite 501 | ) | |
| Arlington, VA 22203 | ) | |
| | ) | |
| GALOIS, INC., | ) | |
| 421 SW 6th Avenue, Suite 300 | ) | |
| Portland, OR 97204 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROBERT WILTBANK, individually, | ) | |
| 421 SW 6th Avenue | ) | |
| Suite 300 | ) | |
| Portland, Oregon 97204 | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Comes now Plaintiff Laura Jane Robinson (hereinafter "Plaintiff"), by and through her undersigned counsel, with her First Amended Complaint (hereinafter "FAC") against Defendants and states as follows:

## INTRODUCTION

This action is initiated by Plaintiff against Defendants ExistX, Inc. ("ExistX"), Galois, Inc. ("Galois"), and Robert Wiltbank ("Wiltbank") collectively ("Defendants"), alleging violations of the False Claims Act, Whistleblower Protection Act, Title VII of the Civil Rights Act of 1964, and Virginia statutory and common law. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

1

## JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

2.      This Court may properly maintain personal jurisdiction over Defendants because their contacts with Virginia and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co*. v. *Washington*, 326 U.S. 310 (1945) and its progeny.

3.      Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of Virginia.

## ADMINISTRATIVE EXHAUSTION

4.      Plaintiff timely filed EEOC Charge No. 570-2025-04539 on September 2, 2025, alleging sex discrimination, retaliation, hostile work environment, retaliatory post-employment disparagement, and other discriminatory activity.

5.      Although, Defendants may contend that Plaintiff worked only for ExistX, Galois exercised direct and pervasive control over Plaintiff's employment and over ExistX's operations, including through overlapping executive leadership, board control, financial control, and Galois personnel's administration of payroll and other core employment functions which makes Title VII apply because they jointly controlled terms and condition of employment.

6.      The EEOC issued Plaintiff a Notice of Right to Sue on February 3, 2026, with a requirement to file in court by May 4, 2026 (90 days).

7.      Plaintiff met that deadline by filing this Amended Complaint on May 4, 2026.

## PARTIES

8.      Plaintiff is a woman over the age of 18, who was employed as the CEO of ExistX from September 11, 2023, until her unlawful termination on March 31, 2025.

9.      Defendant ExistX is technology development and services company incorporated in Delaware and headquartered at 901 N Stuart St Ste 501, Arlington, VA, 22203. The corporation was created as an independent legal spinout entity of Galois, Inc., whose primary purpose was to commercialize Galois's developed research into marketable solutions for operational government users.

10.     Defendant Galois is ExistX's spinout sister company and is a privately held Oregon company, organized as an Employee Stock Ownership Plan (ESOP), and headquartered at 421 SW 6TH Ave Ste 300 Portland, OR, 97204. Defendant Galois is a minority shareholder, but exerts complete financial, operational and managerial control over ExistX.

11.     During the Plaintiff's tenure, Defendant Wiltbank served simultaneously as Chairman of ExistX's board and CEO, and a board member of Galois, maintaining individual control over both entities, and was CEO of both entities at the time Plaintiff's original complaint was filed.

## FACTUAL BACKGROUND

### PLAINTIFF'S BACKGROUND, RECRUITMENT, AND HIRING

12.     Plaintiff is a seasoned female executive in the federal contracting space and was appointed CEO of ExistX, Inc. in September 2023.

13.     She holds a master's degree in electrical engineering from Johns Hopkins University (2004)

and a bachelor's degree in electrical engineering from the University of North Carolina at Charlotte (May 2002).

14.    Plaintiff began working as an engineer in 1999 at the National Security Agency (NSA), working her way from a junior engineer to a senior engineer, and eventually a principal engineer before departing in 2006.

15.    Her work at NSA involved designing, building, and deploying technology solutions, giving her deep, hands-on experience in complex systems engineering.

16.    Plaintiff's early career not only cultivated advanced technical expertise but also provided direct insight into the operational priorities, security frameworks, and program processes of the federal government.

17.    In 2006, Plaintiff joined Booz Allen Hamilton as a technical lead and, over the course of more than a decade, steadily advanced from individual contributor to business leader.

18.    She proactively rotated through roles in engineering, task leadership, program management, and business development, working across the company's classified government business sectors and strategic innovations group.

19.    Through this progression, she built deep expertise in federal contracting, mission-aligned technology development, and regulatory compliance frameworks critical to running businesses supporting federal government programs. She developed a strong reputation for bridging technical expertise and business strategy to support mission-critical government programs.

20.    From 2016 to 2017, Plaintiff worked at Amazon, serving as a technical program manager at Amazon Web Services where she focused on integrating security analytics into day-to-day security operations.

21.    In 2017, Plaintiff moved to Oracle to take a director role within the military and intelligence consulting business with Oracle's national security group. She formed a high-performing business

4

development team that resulted in multiple sole-sourced, net new contracts culminating in a 25% increase in revenue for her business line.

22.     In 2019 Plaintiff left Oracle and took an opportunity as a Senior Director with Hughes Network Systems where she successfully developed and implemented revenue-expanding strategies resulting in a 47% revenue expansion of the Hughes Defense and Intelligence business unit.

23.     Her strategic initiatives included rebranding federal offerings, facilitating dual-use technology transition, and optimizing capture strategies across DoD accounts.

24.     In 2020, Plaintiff moved to ViaSat as a Vice President and executive leader tasked with growing key technology ventures and business strategies for the future.

25.     Seeking to apply her expertise in a more agile and innovation-focused environment, Plaintiff made a deliberate career shift from large defense contractors to the startup and early-stage technology space.

26.     In 2021, Plaintiff was recruited and hired as the Head of Government for Descartes Labs (DL), a commercial geospatial and analytics company.

27.     This role marked Plaintiff's first foray into bridging emerging commercial technology with federal mission applications and developing and leading a business.

28.     Shortly after her hire, Plaintiff played a foundational role in establishing Descartes Labs Government (DLG), a wholly owned subsidiary of DL.

29.     She served as a corporate officer and was part of the original leadership team responsible for structuring DLG to satisfy the security, compliance, intellectual property (IP) licensing, and federal contracting requirements necessary to legally resell and license DL's commercial technology to the U.S. federal government, requirements that the parent company, as a purely commercial entity, could not independently meet.

30.     Under Plaintiff's leadership and strategic direction, DLG quickly matured into a successful government-facing business unit, ultimately generating more than 50% of the parent company's revenue.

31.     Plaintiff's accomplishments creating and leading DLG to flourish, particularly her track record in securing IP licenses for federally funded technologies and navigating SBIR, FAR, and DFARS compliance, led to her recruitment by Galois and eventual hiring as ExistX's CEO.

## PLAINTIFF'S HIRING AND ROLE AT EXISTX

32.     On August 19, 2023, prior to accepting the CEO role and based upon the question about her "ideas", Plaintiff authored and circulated to Chairman Wiltbank a written business strategy presentation titled "Janie's Thoughts on ExistX – Aug 2023," which centered on IP protection, licensing structure, annual recurring revenue (ARR) growth, and mitigation of risks associated with operationalizing Galois-developed technology. Chairman Wiltbank reviewed this strategy before recommending Plaintiff's appointment as CEO.

33.     Prior to receiving a formal offer, Plaintiff was asked by Chairman Wiltbank to provide her "ideas" for ExistX, which she did through the August 19, 2023 strategy presentation.

34.     On or about September 11, 2023, ExistX, Inc. tendered a formal offer of employment to Plaintiff for the role of Chief Executive Officer.

35.     The offer letter was not a preliminary negotiation or tentative proposal; rather, it laid out comprehensive and definitive terms of employment, including (1) an annual base salary of $260,000, (2) eligibility for an annual performance-based incentive bonus of up to $50,000 in 2024 and $100,000 in 2025 and subsequent years, (3) a grant of 700,000 shares of company stock (representing 7% equity), subject to clearly defined vesting milestones tied to performance metrics, and (4) a broad range of employee benefits, including employer-paid health, dental, and vision insurance for Plaintiff and her dependents, 401(k) matching contributions, paid time off, and

6

disability and life insurance coverage.

36.     The offer letter also explicitly confirmed Plaintiff's entitlement to a seat on the company's Board of Directors with full voting rights during her tenure as CEO.

37.     The offer letter specified that Plaintiff would be required to sign a Proprietary Information and Inventions Assignment Agreement ("PIIA") as a condition of employment, further evidencing the parties' intent to form a binding employment relationship governed by specific obligations.

38.     Plaintiff executed the offer letter on September 12, 2023, thereby affirming her acceptance of all material terms without modification.

39.     The offer letter was also signed by the Chairman Robert Wiltbank on behalf of ExistX, demonstrating mutual assent. No language in the agreement indicated that it was non-binding or contingent on further negotiation.

40.     Although the agreement stated that Plaintiff's employment would be "at-will," such a clause merely governed the duration and terminability of employment, not the enforceability of the parties' agreed-upon compensation, equity, and governance rights.

41.     Under both Virginia and federal law, the offer letter constitutes a valid and binding employment contract, supported by mutual assent, clearly articulated consideration, and a mutual intent to be bound. Plaintiff began performing duties in reliance on the agreed terms, further reinforcing the contractual nature of the relationship.

42.     Upon signing the agreement, Plaintiff became CEO and a member of the Board of Directors of ExistX with a base salary of $260,000, ($275,000 at time of termination), an annual incentive bonus tied to performance against the Company's operating plan of $50,000 for FY2024, increasing to $100,000 annually thereafter, and 700,000 shares of ExistX stock that were to vest based on specified milestones.

43.     Consistent with the August 19, 2023 strategy presentation, ExistX's business model was

designed not only to operationalize Galois-developed technology for federal mission customers, but also to serve as a compliance-ready bridge for transitioning mission-relevant technologies from research organizations and startups into federal government use

## STRUCTURE, PURPOSE, AND COMPLIANCE OBLIGATIONS OF EXISTX

44.     ExistX, Inc. is a Delaware C-Corporation, independently incorporated on June 20, 2023.

45.     ExistX's mission was to transition less mature software research and tools into operational capabilities that were mature enough for end users in the government to adopt.

46.     To realize this mission, ExistX required a corporate structure capable of receiving and performing on classified contracts, a multi-disciplinary workforce capable of holding high level security clearances and operating under strict compliance obligations.

47.     The foundation for ExistX's initial market offerings was access to the extensive body of intellectual property developed by Galois over the past 25 years.

48.     Unlike its academic, research-focused sister company, Galois, ExistX was structured for a more traditional, operations-oriented business model and staffed for practical implementation work rather than research.

49.     ExistX was structured for government regulatory compliance, including but not limited to, the Federal Acquisition Regulation (FAR), Defense Federal Acquisition Regulation Supplement (DFARS), 32 C.F.R. Part 117 ("National Industrial Security Program Operating Manual" or NISPOM), and Cybersecurity Maturity Model Certification (CMMC) Program.

50.     Under Federal regulations and guidelines, contractors must adhere to all contractual terms, avoid any action that could place the company in violation, and individuals holding security clearances are required to maintain the highest standards of honesty, integrity, and reliability.

51.     Even before her hiring, Plaintiff had expressed in the August 2023 document the importance of meeting these standards and communicated that the submission of proposals incorporating technology owned by Galois without a finalized Intellectual Property (IP) license

8

defining ownership and data rights could expose ExistX to material compliance risks.

52. ExistX's compliance posture was essential for ExistX to propose for, be awarded, and execute contracts with U.S. government entities.

53. In addition to her role as CEO, Plaintiff was formally appointed by the ExistX Board as the company's Senior Management Official (SMO), Facility Security Officer (FSO), and Insider Threat Program Senior Official (ITPSO).

54. These roles carried direct responsibility under the Defense Counterintelligence and Security Agency (DCSA) regulations governing contractor Facility Clearance and access to classified information.

55. Each role carried distinct legal responsibilities, with implications of civil and criminal penalties for violations, whether failures to comply were intentional or negligent.

56. Mismanagement of security and compliance protocols could have resulted in revocation of the company's Facility Clearance, debarment from federal contracting, or loss of her own personal security clearance.

57. Plaintiff actively used these roles to establish and enforce a compliance culture aligned with federal requirements.

58. This heightened level of personal responsibility required Plaintiff to identify, raise, and address potential compliance failures and to raise and resist conduct she reasonably believed could violate federal law, including the False Claims Act.

59. These compliance obligations required Plaintiff to identify, raise, and refuse conduct that could violate federal law, including misrepresentation of intellectual property rights.

## PLAINTIFF'S REASONABLE BELIEF IN COMPLIANCE OBLIGATIONS

60. At the time Plaintiff assumed her role as CEO, it was objectively reasonable for her to believe that ExistX had been structured in a manner consistent with federal contracting requirements and standard industry practices.

61. Galois had more than two decades of experience operating as a defense contractor and had previously launched multiple spinout companies using what it described as a "proven" model.

62. Plaintiff was recruited to lead ExistX based on that representation and had no reason to suspect that the company's foundational structure deviated from accepted norms.

63. As a traditional defense contractor Galois is subject to compliance audits of their cost accounting system and financial practices by the Defense Contract Audit Agency (DCAA), further reinforcing the reasonableness of Plaintiff's reliance.

64. Consistent with standard business practices, any operational support provided by Galois during ExistX's early stages would reasonably be expected to be governed by formal, arm's-length arrangements, such as a shared services agreement or equivalent structure ensuring appropriate separation of functions.

65. Plaintiff was recruited based on Galois's stated objective of operationalizing its research through ExistX, including technologies such as 5STARS, and its commitment to executing formal IP licensing arrangements to support that effort.

66. ExistX was the eighth Galois spinout, and publicly Galois represented that they followed a "proven spinout formula" as described in a July 24, 2023, Galois blog post authored by Defendant Wiltbank, "Spinning Out, Creating Impact," that showed logos of the ExistX and other Galois spinouts such as TangramFlex, Inc., Niobium Microsystems, Inc., and ThatDot, Inc.

67. Per this blog post, Defendant Wiltbank states that each spinout "...operates independently, with its own management, team and board…" where Galois offers "…strategic rather than operational input and leadership," reinforcing the impression of a structured and replicable model.

68. Given these representations, Galois's quarter century of experience as a federal contractor, and ExistX's early-stage status, Plaintiff had no reason to question the company's legal or operational structure or the involvement of Galois personnel and reasonably believed she was

10

operating within a compliant and independent framework. This belief was not speculative; it was grounded in Galois's representations, industry norms, and Plaintiff's prior experience structuring compliant federal contracting entities.

69.    Consistent with these expectations, as Plaintiff settled into her CEO role, engaged with existing ExistX personnel, she realized some ExistX employees were also employees of Galois, such as Mr. Bauer, and began to identify inconsistencies between the formal structure and actual operations.

70.    These issues became apparent through her efforts to implement compliant business practices and operational independence, at which point she took steps to address the resulting risks.

71.    For example, in January 2024, Plaintiff led the transition of ExistX's IT system from Google Workspace to a Microsoft 365 environment, compliant with CMMC and NISPOM requirements.

72.    The upgrade introduced access controls and audit trails necessary for handling Controlled Unclassified Information (CUI), bringing ExistX's systems into alignment with federal security requirements.

73.    This change also marked the first time Defendant Wiltbank expressed dissatisfaction with Plaintiff's actions, as the change brought restricted calendar sharing and limited system access for non-ExistX personnel, including Galois staff, which in turn curtailed Defendant Wiltbank's own access.

74.    His reaction marked the beginning of broader resistance to Plaintiff's efforts to enforce lawful separation and compliance between the two entities.

75.    Defendant Wiltbank's response was part of a broader pattern of resistance to Plaintiff's efforts to meet her legal obligations under federal security regulations.

11

## EXISTX FORMAL CORPORATE STRUCTURE

76.     Despite being formed as an independent corporation, ExistX's governance and operations were not operated independently in practice and were materially influenced by Galois.

77.     That separateness is reflected in the company's June 2023 corporate filings and reiterated in a Independent Contractor, Professional Services Agreement ("PSA") between ExistX and Galois, executed on August 28, 2023, which was prior to Plaintiff's tenure.

78.     Under this PSA, ExistX agreed to provide business development related professional services, on a discrete fixed-price basis for: sales opportunity identification, technology roadmap consulting, and advisory services for technology transition.

79.     The PSA does not include any shared services or other agreement authorizing integrated operations; rather, it disclaims any agency relationship and confirms that ExistX has no authority to bind Galois and vice versa, and that each entity retains control over its own operations, personnel, and obligations.

80.     The PSA was executed on behalf of ExistX by Matt Bauer (hereinafter "Mr. Bauer"), who was serving as a *fractional* Chief Technology Officer for ExistX while simultaneously employed as a full time Principal Scientist by Galois, and was countersigned by Galois General Counsel Jodee LeRoux (hereinafter "Ms. LeRoux").

81.     Despite these express terms requiring independence, ExistX's governance and operations were not conducted in accordance with this structure.

## BOARD-LEVEL CONTROL AND GOVERNANCE FAILURES

82.     Other than the Plaintiff, the Board of Directors for ExistX lacked independence from Galois and had a total of 3 members: Plaintiff; Defendant Robert Wiltbank (CEO of Galois and member of the Galois board of directors, and ExistX board chairman); and Dr. John Launchbury (Co-Founder and CTO of Galois, Galois board member, the largest individual shareholder of ExistX, and ExistX board member) (hereinafter "Dr. Launchbury").

12

83.     Following investment from Hale Capital Partners, Inc. (HCP) into ExistX, this pattern of overlapping control continued and deepened.

84.     The Board expanded to include three representatives of HCP, two as voting Board Members (one held by HCP employee Nate Foos (hereinafter "Mr. Foos"), the other initially vacant) and one as a Board Observer (Marty Hale, HCP's CEO) (hereinafter "Mr. Hale").

85.     Although the investment introduced outside capital intended to accelerate ExistX's growth and operating independence, it instead reinforced pre-existing entanglements within the Galois ecosystem.

86.     HCP holds a voting seat on Galois' Board of Directors and maintains financial investments and board seats across Galois spinouts, including TangramFlex, Inc., Niobium Microsystems, Inc., and ThatDot, Inc..

87.     Accordingly, all voting members of the board, other than Plaintiff, were either current Galois executives, Galois board members, or had individuals who represented organizations with financial positions in Galois' Spinout ecosystem.

88.     As a result, Plaintiff was the only independent voice on the Board and the only director not beholden to Galois or Galois' investment interests, and governance decisions were therefore not made by a fully independent board.

89.     This overlap created operational, financial, and legal conflicts of interest between ExistX and Galois.

90.     This lack of independence at the Board level enabled Galois to exert control over ExistX's operations beyond what was contemplated in the governing agreements. This structure effectively placed control of ExistX in the hands of individuals and entities whose interests were aligned with Galois, rather than in an independent board acting in ExistX's best interests.

13

## GALOIS FINANCIAL CONTROL AND COMPARATOR-BASED COMPENSATION DISPARITIES OVER EXISTX

91.    This overlap was substantial, placing the same individuals in control of financial systems, cost allocation decisions, executive compensation, and contractual representations for both a prime contractor and its subcontractor.

92.    One such conflict is seen in the case of Dan Boyer (hereinafter "Mr. Boyer") who simultaneously served as Chief Financial Officer (CFO) of both Galois and ExistX, while also serving as Corporate Secretary and Treasurer for both companies' boards.

93.    Plaintiff was not a signatory, nor was she granted access to ExistX bank accounts. Instead, she was required to route all financial decisions, labor cost allocation, and invoices through Galois executives, including Defendant Wiltbank and Mr. Boyer.

94.    Galois personnel, who were not employees of ExistX, maintained unfettered access to and control over ExistX's payroll, accounts payable, and expense approvals.

95.    Compensation decisions likewise were not made independently by ExistX in an arm's-length manner, but were centrally controlled by the same decisionmakers, including Defendant Wiltbank and Mr. Boyer.

96.    As a result of this centralized financial control, executive compensation was not determined through independent corporate governance, but through coordinated Galois–ExistX decision-making, allowing the same individuals to dictate compensation outcomes across roles, individuals, and entities.

97.    Plaintiff's compensation was directly controlled, adjusted, and evaluated by these centralized actors, despite her role as CEO and Board member, and without independent authority to approve or modify executive compensation decisions.

98.    This centralized financial authority was not applied neutrally, but was exercised in a manner that resulted in more favorable compensation outcomes for male executives operating within the

same structure.

99.     This pattern of decision-making by centralized actors reflects a consistent practice in which similarly situated male executives were treated more favorably than Plaintiff with respect to compensation, equity, and enforcement of performance-based requirements.

100.    Plaintiff's responsibilities materially exceeded those of a traditional CEO. In addition to executive leadership, fundraising, operations, and compliance accountability, Plaintiff directly performed the functions of a typical CTO, including product-direction, licensing-structure, solution ideation, and technical-strategy.

101.    Plaintiff therefore carried both the broadest executive responsibilities in the company and responsibilities comparable to, and in practice exceeding, those of a CTO, performing substantially equal or greater work than male technical executives who were compensated at higher levels. These facts demonstrate that Plaintiff performed substantially equal or greater work than male comparators while receiving lower compensation under the same decisionmakers.

102.    Notwithstanding Plaintiff's broader responsibilities, Defendants, acting through this centralized control structure, compensated a male CTO, Mr. Bauer, at approximately $295,000 annually, an amount exceeding Plaintiff's base compensation of $260,000, despite his role being narrower and subordinate to Plaintiff's executive authority.

103.    Following Plaintiff's termination, Defendant Wiltbank, exercising the same centralized authority, approved compensation for a male CTO, Ashwin Fisher, at a salary of approximately $300,000 with an annual bonus of $75,000, further exceeding Plaintiff's compensation during her tenure, despite that role carrying narrower responsibilities than Plaintiff's combined CEO and CTO-level functions.

104.    Because these compensation decisions were made by the same individuals exercising unified control over both Galois and ExistX, the resulting disparities reflect not independent business

15

judgment, but discretionary decisions within a common control structure that produced unequal compensation outcomes for Plaintiff relative to male comparators.

105. This centralized control also extended to equity compensation and the enforcement of performance-based vesting conditions.

106. Mr. Bauer was granted approximately 700,000 shares of ExistX equity, comparable to Plaintiff's equity as CEO, which was subject to defined vesting milestones tied to performance.

107. Mr. Bauer did not meet the required milestones for vesting. Notwithstanding this failure, Defendant Wiltbank, acting in his capacity as Chairman of the ExistX Board and within the same centralized control structure, exercised discretionary authority to allow Mr. Bauer to retain approximately 200,000 shares of equity.

108. This decision was made over Plaintiff's objection and outside the standard vesting framework, demonstrating that Defendants possessed and exercised unilateral authority to override compensation structures when doing so benefitted a male executive.

109. By contrast, no such discretionary adjustments were made to Plaintiff's compensation or equity despite her meeting or exceeding performance expectations, including securing funding, contracts, and operational milestones for the company.

110. These actions demonstrate that Galois's centralized financial control over ExistX included the authority to set, adjust, and override executive compensation and equity outcomes, and that this authority was exercised in a manner that produced more favorable outcomes for male executives under the same decisionmakers, further evidencing a unity of interest and lack of corporate separateness between Galois and ExistX.

111. These functions were performed without independent oversight or authority from ExistX leadership. As a result, core financial and compensation functions were controlled by Galois, not ExistX.

112. This centralized financial control extended beyond financial administration and directly impacted executive authority. Major executive and governance decisions were likewise made without Plaintiff's input despite her status as CEO.

113. For example, Plaintiff learned of Mr. Bauer's departure and related payroll actions only after those matters had already been discussed and processed by Galois leadership, including Mr. Boyer, and Defendant Wiltbank.

114. These facts demonstrate that Plaintiff did not possess the authority typically associated with a CEO, including authority over executive staffing, compensation, administration, or governance decisions.

115. As a result, ExistX functioned as a unified enterprise under common control, with separateness disregarded in practice but remained subject to Galois's direction and control, such that the separateness between the entities was disregarded in practice and used to implement and justify compensation and governance decisions that disadvantaged Plaintiff.

116. This structure risked obscuring billing transparency, subcontract disclosures, cost representations, and executive compensation practices in connection with federal contracting activities.

117. This unified control structure allowed Defendants to exercise discretionary authority across both entities in a manner that obscured accountability, enabled preferential treatment of male executives, and resulted in materially unequal compensation and governance outcomes for Plaintiff.

**GALOIS LEGAL CONTROL OVER EXISTX**

118. This centralized operational control extended beyond general financial management to legal oversight and decision-making.

119. Legal counsel for ExistX was centralized with Galois's General Counsel, Ms. Leroux.

120. Ms. LeRoux was never an employee of ExistX, a consultant, nor had a formalized retainer

17

relationship with ExistX, to Plaintiff's knowledge.

121.    Despite her involvement in sensitive matters, Ms. LeRoux owed no documented duty of loyalty to ExistX. She advised ExistX leadership on issues involving Galois interests, including IP licensing, employment, and compliance, without a formal firewall.

122.    This dual representation undermined attorney-client privilege and created conflicts of interest and impaired ExistX's ability to obtain independent legal advice regarding compliance and contractual obligations.

123.    Legal lines were further blurred by Defendant Wiltbank's reliance on Mr. Boyer, an attorney barred in Oregon, and the CFO mentioned earlier.

124.    Even though Mr. Boyer was not a counsel of record for either entity, Defendant Wiltbank encouraged Mr. Boyer to routinely provide "legal" advice to Plaintiff and others.

125.    Mr. Boyer's guidance was often given great deference and accepted in good faith, despite a clear conflict of interest.

126.    As a result, ExistX lacked independent legal representation, further undermining its ability to operate as a compliant and autonomous federal contractor.

### GALOIS FEDERAL CONTRACT CONTROL OVER EXISTX

127.    This overlapping control also extended to technical execution of federal contracts, including the definition, oversight, and approval of contract deliverables.

128.    Individuals, including Mr. Bauer, simultaneously performed technical leadership roles for both Galois as prime federal contractor, and for ExistX as federal subcontractor to Galois on the same programs where ExistX's performance was subject to Galois's direction and acceptance.

129.    In this dual capacity, Mr. Bauer operated as a technical lead for Galois while also serving as a *fractional* Chief Technology Officer for ExistX, directing technical execution across both entities, including the scope, evaluation, and acceptance of technical work performed by ExistX.

130. Mr. Bauer remained a full-time Galois employee subject to the direction and control of Galois leadership, including Defendant Wiltbank, while performing these functions for ExistX, thereby placing Galois in a position to influence the approval of deliverables and the corresponding invoicing and payment processes tied to ExistX's work.

131. As a result, ExistX's financial operations, personnel decisions, and technical execution were subject to Galois's direction and control in practice, notwithstanding its formal corporate structure.

132. This structure rendered ExistX financially and operationally subordinate to Galois, contrary to federal acquisition requirements for contractor independence.

133. This overlap eliminated meaningful separation between the prime contractor and subcontractor roles.

134. It further impaired ExistX's ability to operate as an independent entity in managing government contracts requiring autonomy, security compliance, and internal controls.

135. This structure left ExistX unable to assert its corporate rights, negotiate independently with Galois or other 3rd parties, or assess and manage legal and compliance risk without interference.

136. Strategic and legal decisions were filtered through individuals whose loyalties were divided, and more specifically, often aligned with Galois.

137. Under federal contracting rules, such overlap created risks under federal contracting rules governing organizational conflicts of interest outlined in FAR Subpart 9.5, which require contractors to be organizationally independent and protect against undue influence or access to competitively sensitive information.

138. In classified contracting, it further raised compliance concerns regarding segregation of authority and access controls between entities handling sensitive information under the NISPOM and regulatory and compliance concerns under DFARS 252.204-7012, which require segregation

19

of authority and access controls between entities handling CUI.

139. Plaintiff raised concerns during her tenure regarding the compliance risks created by overlapping executive control and the absence of clear arm's-length separation between the entities.

140. When executives control both sides of a contract with no arm's-length separation, courts may pierce the corporate veil and hold both entities jointly liable for contractual breaches, mischarging, or False Claims Act violations.

## PLAINTIFF'S PERFORMANCE, GROWTH AND COMPLIANCE MILESTONES

141. At the end of May 2024, Plaintiff secured ExistX's facility security clearance, under the NISPOM, 32 C.F.R. Part 117, a key federal compliance milestone.

142. As ExistX's FSO, Plaintiff personally certified to the DCSA that ExistX operated with the independence and safeguards required of a cleared contractor.

143. This certification reflected that ExistX met the operational and compliance standards expected under federal law. With this clearance, ExistX became eligible for classified contracts and could hire cleared personnel.

144. Less than a week later, in early June 2024, ExistX was awarded their largest government contract to date, a $2 million award.

145. This validated work done by Plaintiff to establish the organization and the government's confidence in ExistX's compliance, independence, and security and positioned the business for success in its first year.

146. Building on this success, Plaintiff led and closed a successful $3 million capital raise from a private equity firm on December 30, 2024, increasing ExistX's valuation to $12 million.

147. The funding further demonstrated investor confidence in her strategic direction, her leadership and positioned ExistX to expand beyond reliance on any single partner, such as Galois, by operationalizing technologies from multiple sources, consistent with Plaintiff's business

20

strategy.

148. Plaintiff subsequently won another award of a significant government contract to ExistX as a Prime Contractor in February 2025, marking a critical inflection point in growth and recognition of the company.

## BACKGROUND ON 5STARS INTELLECTUAL PROPERTY (IP)

149. Securing government contracts was crucial to ExistX's success.

150. Before a contractor may offer, propose, or deliver technology to the federal government, it must hold the legal rights to use that technology, either through ownership or a valid, written license.

151. This requirement applies across procurement methods, including contracts subject to the Federal Acquisition Regulation (FAR), the Defense Federal Acquisition Regulation Supplement (DFARS), and non-FAR instruments such as Other Transaction Authority (OTA) agreements under 10 U.S.C. § 4022.

152. In this case, ExistX had a federal contracting opportunity to operationalize the Galois developed Small Business Innovation Research (SBIR) technology, "5STARS" (5G SDN Tools for Automated and Reliable Security).

153. For technology, like 5STARS, developed under the federal SBIR program, 15 U.S.C. § 638 and the SBA's SBIR/STTR Policy Directive, the awardee, in this case Galois, retains ownership of the underlying technology and associated intellectual property, subject to a defined SBIR data rights protection period during which the government's ability to use, release, or disclose technical data is restricted.

154. During this SBIR data rights protection period, the government receives limited rights to use the data for government purposes but may not disclose it outside the government except under limited circumstances or authorize third parties to use the data absent proper licensing.

155.    Consistent with this framework, any third party seeking to use, integrate, or build upon SBIR-developed technology must obtain a valid license from the awardee that preserves these data rights protections and accurately reflects the rights being conveyed.

156.    Absent such a license, a third party cannot lawfully represent that it has the right to use or deliver the technology in performance of a federal contract, and doing so risks loss of SBIR protections, contractual default, and liability under the False Claims Act, 31 U.S.C. § 3729.

157.    Accordingly, before proposing or performing any federal work involving 5STARS, ExistX was required to obtain a valid and compliant license from Galois.

158.    Against this legal and regulatory backdrop, ExistX was created in part to utilize Defendant Galois's technology in its projects, making a valid and compliant intellectual property license from Galois a prerequisite to ExistX's ability to pursue and perform federal contracts involving 5STARS or any derivative thereof.

**PLAINTIFF'S PROTECTED ACTIVITY WITH RESPECT TO INTELLECTUAL PROPERTY AND THE EXISTX LICENSING AGREEMENT WITH GALOIS**

159.    Plaintiff recognized the need for a compliant intellectual property licensing strategy even prior to her employment, including in her August 2023 "Thoughts on ExistX" provided to Defendant Wiltbank.

160.    On or around November 13, 2023, Plaintiff drafted an "EX IP Collaboration Agreement Template" and an "EX Policy for Intellectual Property Management." She shared those materials with Defendant Wiltbank by email on November 23, 2023, and, in or around that time, meetings occurred between ExistX and Galois on this topic, including Galois General Counsel, Ms. LeRoux.

161.    On January 29, 2024, ExistX's Board approved Plaintiff's IP strategy, and was informed that formal written licenses were required for ExistX to lawfully submit proposals and perform federal work using Galois technology, including SBIR-funded technology such as 5STARS.

162.    Despite this shared understanding at the Board level, Defendants did not implement the

licensing structure necessary to support lawful proposal activity.

163. Defendant Wiltbank repeatedly dismissed Plaintiff's concerns, directing her not to focus on the IP requirements, asserting that the relationship between Galois and ExistX was so "trusted" that this paperwork wasn't necessary, instructing her to continue pursuing federal contracts leveraging Galois-owned technology.

164. Throughout this period, Plaintiff continued to act in good faith, operating under the belief that appropriate licensing agreements would eventually be formalized. At all times, Plaintiff sought to ensure that ExistX's proposal and performance activities complied with applicable federal contracting and intellectual property requirements. Plaintiff's efforts to secure compliant licensing and prevent unlawful proposal activity constituted protected activity under applicable federal law.

165. This failure persisted throughout 2024 and became increasingly consequential in early 2025, when ExistX identified an imminent federal opportunity requiring formal proposal submission and confirmed rights to use Galois-developed technology.

**PLAINTIFF SOUGHT IP LICENSING FOR A NEW GOVERNMENT CONTRACT**

166. This support was consistent with prior communications from Galois regarding ExistX's role in operationalizing 5STARS. For example, on January 7, 2025, Mr. Darais informed Plaintiff that Galois had received funding to develop new capabilities for 5STARS and stated that Galois would "love to explore…how we can leverage these upcoming 5STARS capabilities within our 5STARS+ExistX partnership." This communication reinforced Plaintiff's understanding that ExistX was expected to utilize and build upon 5STARS in collaboration with Galois.

167. At the January 16, 2025 ExistX Board meeting, Galois, through Defendant Wiltbank, acting in his dual capacity as Galois CEO and Chairman of ExistX, represented that it would move forward with formalizing an IP licensing agreement.

168.    As part of that process, a draft agreement, including 5STARS, was to be circulated for Board review within the following week, reflecting the Board's shared understanding that formal licensing was required for ExistX to lawfully pursue federal contracting opportunities involving Galois technology.

169.    In late January 2025, a federal contract opportunity that Plaintiff and her team had been shaping for months involving 5STARS moved into a qualified contracting phase, with an anticipated Other Transaction Authority ("OTA") award to ExistX as prime contractor in mid-February 2025. Despite this urgency, Galois did not produce a draft IP licensing agreement for Board review.

170.    In early February of 2025, Plaintiff and her team identified a qualified opportunity with a federal organization seeking to operationalize Galois SBIR technology, 5STARS.

171.    On February 5, 2025, Plaintiff exchanged emails with Mr. Darais, regarding the federal customer's interest, he responded with enthusiasm stating that he and Galois were "definitely interested to pursue any/all of these 5STARS threads" with Plaintiff and her team.

172.    On or around February 11, 2025, after still not receiving a draft IP licensing agreement and concerned about the imminent OTA award, Plaintiff requested that Galois provide a written memorandum documenting its intent to execute an IP licensing agreement with ExistX for 5STARS and other key technologies.

173.    On February 14, 2025, Galois General Counsel provided Plaintiff with a signed and dated memorandum on Galois letterhead stating: "This letter serves as a formal acknowledgement of Galois intent to enter into a perpetual licensing agreement with ExistX… Galois confirms its intent to grant ExistX perpetual license agreement to technologies… including but not limited to 5STARS, CADENAS, and CAMDEN."

174.    On or about February 16, 2025, Plaintiff was formally notified that ExistX had been accepted

24

into a government-sponsored Other Transaction Authority (OTA) procurement mechanism. This acceptance was a formal government-awarded procurement vehicle under which ExistX, as prime contractor, was authorized to submit project proposals directly to the Government.

175.    This acceptance reflected the government's interest in operationalizing multiple Galois-developed technologies, including 5STARS, for mission-critical applications. Plaintiff immediately informed Galois and her ExistX board.

176.    This sequence of communications, from initial support to formal written commitment to license, to continued technical alignment, reflected a consistent understanding between Plaintiff and Galois that ExistX would pursue the opportunity using 5STARS under a forthcoming licensing agreement.

177.    At that time, Plaintiff had in hand a signed memorandum from Galois confirming that an IP licensing agreement, including 5STARS, was in the process of being finalized, together with contemporaneous written support from Galois technical leadership, including Mr. Darais. Plaintiff reasonably believed that Galois would finalize the necessary license in time to support the anticipated OTA submission in compliance with applicable requirements.

178.    In a recorded phone call on February 18, 2025, Defendant Wiltbank informed Plaintiff that Galois had hesitations regarding the IP license agreement and attributed those concerns to Mr. Darais, the principal scientist associated with 5STARS, stating that issues had been raised requiring attention to "build trust" around the licensing.

179.    The following day, February 19, 2025, Plaintiff reached out to Mr. Darais personally to clarify, given every communication to date between them had been full support. In that text exchange, David said "…you [Plaintiff] hadn't upset me [him]…" and that he "…was still 100% in the dark…" and described it as "…a bit weird if Rob [Defendant Wiltbank] …are framing me [David Darais] as being upset." He further stated that he "…hadn't talked to either of them about

25

this topic [IP licensing] yet."

180.    He closed his discussion with Plaintiff by assuring her that "We're solid."

181.    This exchange directly contradicted Defendant Wiltbank's representation the day prior and demonstrated that the purported concerns attributed to Mr. Darais were not communicated to him, did not originate from him, and were inaccurately represented to Plaintiff.

182.    The Galois IP license agreement Google Document version history reflects that edits to the draft IP license ceased on February 19, 2025, with Mr. Boyer and Ms. LeRoux, as the Galois editors.

183.    On February 26, 2025, The ExistX Board still did not have a draft copy of the IP license agreement. That same day, Defendant Wiltbank sent an email to the ExistX Board stating that he was "juggling a couple of engineer concerns" while assuring the Board that the draft IP licensing agreement would be sent to them for review by Friday, February 28, 2025.

184.    In text messages on or about Feb 26, 2025, between Plaintiff and Galois Chief Revenue Officer (CRO), Andrew Saxton (Hereinafter, "Mr. Saxton"), Plaintiff continued to seek clarity on the situation, he referenced internal Galois licensing discussions occurring. Plaintiff was excluded from those discussions and when she pointed out she was receiving contradictory feedback, Mr. Saxton's reply was "There are multiple concerns at play…"

185.    On February 28, 2025, the same day Wiltbank had assured the ExistX Board that a draft IP license would be delivered, Mr. Darais sent Plaintiff an unexpected email directive stating: "As of today, we are shifting focus to prioritize our internal-to-Galois efforts relating to 5STARS. Unfortunately, this means fully de-prioritizing our collaboration with ExistX on anything 5STARS related." The email then went into non-ambiguous direction stating that Plaintiff and ExistX were "…not include 5STARS in any upcoming contract (OTA, IDIQ, etc.)." and also that Galois would no longer "…engage in any sales/support or knowledge transfer meetings..."

186.    The cessation of work on the draft IP license occurred prior to, and in close temporal proximity with, the February 28 directive halting collaboration on 5STARS.

187.    At that point, Plaintiff was faced with an explicit written directive to exclude 5STARS from proposals while no valid license existed, reinforcing her understanding that any proposal submission involving 5STARS without documented rights would be improper.

## PROTECTED ACTIVITY AND BOARD ESCALATION

188.    On March 1, 2025, Plaintiff responded to Mr. Darais expressing surprise and concern regarding the abrupt shift. She noted that she and Galois had engaged in over a year of open and collaborative efforts to develop joint ExistX–Galois projects aimed at transitioning 5STARS research to operational users, and that she understood the parties to be aligned in advancing those efforts.

189.    Plaintiff further stated that, although she had been informed that "concerns" existed, no such concerns had been clearly communicated to her despite repeated attempts to engage directly with both Mr. Darais and Galois leadership.

190.    That same morning, Plaintiff notified the full ExistX Board in writing and requested an emergency meeting. She informed the Board that: (i) Galois had withdrawn authorization to use 5STARS in connection with proposals and customer engagement; (ii) no executed IP license existed; and (iii) submission of any 5STARS-based proposal would require ExistX to represent rights it did not hold and would not comply with federal or state procurement policies.

191.    At the March 3, 2025, emergency Board meeting, Plaintiff reiterated that she would not authorize submission of any proposal involving 5STARS, or any other Galois-owned technology, without a valid, written license granting ExistX documented rights.

192.    She explained that proceeding without such documentation would require ExistX to represent rights it did not possess and would violate applicable federal contracting requirements.

193.    Plaintiff's refusal to proceed without a valid license, and her escalation of these concerns

to the Board, constituted protected activity undertaken to ensure compliance with federal law and to prevent misrepresentation in connection with a federal procurement. Plaintiff's refusal was based on her reasonable belief that submitting a proposal involving 5STARS without documented rights would require ExistX to make a false representation to the Government.

## DEFENDANTS' RETALIATORY SCHEME AGAINST PLAINTIFF

194.    While Plaintiff was escalating these compliance concerns and refusing to proceed without a license, Defendants were conducting internal 5STARS licensing discussions from which Plaintiff was excluded.

195.    In a recorded April 17, 2025, call, Defendant Wiltbank admitted that he had had "about eight personal conversations" with Mr. Darais regarding 5STARS IP licensing leading up to the February 28 directive.

196.    These communications occurred during the same period in which Plaintiff was actively seeking clarification and attempting to resolve any stated concerns, yet she was not included in those discussions. This exclusion deprived Plaintiff of the opportunity to address or respond to the purported concerns and allowed Defendants to shape the narrative regarding 5STARS licensing without her involvement.

197.    Within 24 hours of Plaintiff's termination on March 31, 2025, Defendant Wiltbank, now CEO of ExistX as well as Galois, began encouraging remaining ExistX personnel to continue pursuing 5STARS-based opportunities. Those employees declined to proceed until a formal IP license agreement was in place.

198.    In an April 28, 2025, recorded call, Defendant Wiltbank told multiple ExistX employees, "I don't think we broke the law a single time with respect to 5STARS." During that same discussion, ExistX employees told him they "could not in good conscience pitch" Galois technology without a valid IP license.

199.    Contemporaneously with those statements, and as reflected in document version history,

28

Galois leadership resumed work on the same IP licensing agreement that had not been provided to Plaintiff or the ExistX Board before her termination.

200. On or about April 28, 2025, approximately one month after Plaintiff's termination, an IP license was executed only after remaining ExistX employees continued to raise compliance concerns and refused to proceed without documented rights.

201. This sequence demonstrates that Defendants recognized the necessity of a formal license, ultimately implemented one after Plaintiff's termination, and nevertheless characterized Plaintiff's insistence on that same requirement as improper, obstructive, or a lack of "trust."

202. This pattern of excluding Plaintiff from decision-making, reframing her compliance efforts as disloyalty, and conditioning her authority on alignment with Galois leadership was consistent with Defendants' broader conduct throughout 2024 and early 2025, in which Plaintiff's efforts to enforce legal compliance and operational independence were repeatedly characterized as disloyal or obstructive.

**DFENDANT WILTBANK RETALIATED AGAINST PLAINTIFF BY UNDERMINING HER AUTHORITY AND SOWING STRIFE WITH HER TEAM AND GALOIS**

203. Throughout 2024 and continuing into early 2025, both before and during Plaintiff's protected activity, Defendant Wiltbank and Galois personnel engaged in a sustained pattern of conduct that undermined Plaintiff's authority as CEO, interfered with her ability to manage ExistX operations, and conditioned her authority on alignment with Galois leadership.

204. This conduct was enabled by the same centralized control structure described above and created a work environment in which Plaintiff's authority was systematically challenged, her decisions were second-guessed, and her independent exercise of leadership was treated as improper.

205. In or around April 2024, Plaintiff experienced a concrete breakdown in her ability to exercise executive authority. ExistX's *fractional* Chief Technology Officer, Mr. Bauer, resigned

from his role with the company and returned to singular employment with Galois.

206. Plaintiff, despite serving as CEO, was not informed of this development by Defendant Wiltbank, CFO Mr. Boyer, or Mr. Bauer himself. Instead, Plaintiff first learned of Bauer's departure from the CEO of Galois Spinout company, TangramFlex, who contacted her after being informed by Defendant Wiltbank.

207. Contemporaneous communications confirm that Galois leadership had already processed Mr. Bauer's departure without Plaintiff's knowledge.

208. CFO Mr. Boyer authorized the removal of Mr. Bauer from ExistX payroll, and Defendant Wiltbank acknowledged in a text to Plaintiff that he his "disclosure" to the TangramFlex CEO was a mistake, stating that he "fucked that up" and "shouldn't have said anything."

209. Defendant Wiltbank's statement did not address Plaintiff's exclusion from the decision-making process but instead focused only on how the information had been communicated.

210. This incident demonstrates that material leadership decisions affecting ExistX were being made, executed, and communicated by Galois leadership without Plaintiff, while Plaintiff remained responsible for the company's performance, personnel, and contractual obligations.

211. This exclusion deprived Plaintiff of the authority associated with her role as CEO and established a pattern in which her role was treated as subordinate to Galois-controlled decision-making.

212. This pattern of authority undermining manifested across multiple areas of Plaintiff's role, including executive decision-making, workplace conditions, contract execution, and personnel management.

213. In or around May 2024, Plaintiff's employees reported repeated instances of inappropriate workplace conduct by Galois employees in the shared Dayton, Ohio office. Plaintiff promptly escalated these concerns to ExistX Director of People Operations.  In doing so, Plaintiff engaged

in protected activity.

214. The misconduct included gender-based and demeaning comments directed at female employees. One Galois employee mocked a female ExistX employee's medically required dietary restrictions and stated she was "too high maintenance to work with," reinforcing gender-based stereotypes.

215. In addition to these comments, Galois personnel told ExistX employees that they were not welcome in the shared workspace.

216. On October 9, 2024, a Galois employee, Dan Ly, sent an email to ExistX personnel acknowledging that there had been "conversations from a Galois person about needing office space and other people (not Galois) should leave," while attempting to reassure them that such decisions were not made by a single individual and that they were "always welcome."

217. This communication confirmed that the issue had become sufficiently serious and visible to require intervention by another Galois employee. Despite this acknowledgment, the underlying conduct was not remedied.

218. As a result of the ongoing environment, ExistX employees began avoiding the office entirely. At least one female employee requested that a male colleague escort her to and from her car when she did attend the office due to concerns about her safety.

219. These conditions affected not only Plaintiff's employees, but also Plaintiff's ability to perform her role as CEO, as she was required to manage employee safety concerns, respond to ongoing misconduct, and address resistance from Galois leadership when she attempted to intervene.

220. The Dayton Office situation continued to deteriorate. In September 2024, ExistX personnel were avoiding the office which was negatively impacting team cohesion and productivity.

221. Defendants Wiltbank and Galois failed to conduct a meaningful investigation or implement

corrective measures.

222. Plaintiff took steps to protect her team by securing a separate Dayton area workspace. Rather than supporting these actions, Defendant Wiltbank reprimanded Plaintiff for acting "without approval" and questioned Plaintiff's decision stating they didn't believe the situation was as serious as reported.

223. This pattern of undermining Plaintiff's authority extended beyond workplace conditions and into ExistX's ability to execute contracts and pursue business development opportunities.

224. In this same period, on or about August 20, 2024, this dynamic escalated into direct interference with ExistX's ability to pursue follow-on work under an existing Air Force Research Laboratory ("AFRL") contract, for which Galois served as prime contractor and ExistX as subcontractor.

225. The DFAMS contract had previously been managed within ExistX by the former fractional CTO, Mr. Bauer, who served in a dual role supporting both ExistX and Galois. During that period, ExistX maintained visibility into and participation in contract execution and follow-on planning. Following Mr. Bauer's departure from ExistX and return to Galois, that dynamic changed.

226. After Mr. Bauer's departure, Galois sales employee Aaron Miller assumed a central role in communications regarding DFAMS follow-on efforts. Unlike Mr. Bauer, Mr. Miller was not an employee of ExistX and did not operate within ExistX's leadership structure.

227. During this period, Plaintiff experienced increased resistance in pursuing follow-on work, including instances in which Mr. Miller interfered with or disrupted engagement efforts with AFRL.

228. This shift in control, from an ExistX-integrated technical lead to a Galois-controlled sales representative, occurred during the same period in which Plaintiff refused to defer to Galois personnel in business development decisions and with a decline in ExistX's ability to secure

follow-on work under the DFAMS contract.

229. Rather than support these efforts, Defendant Wiltbank continued to demand that Plaintiff include Mr. Miller in ExistX business development and federal capture activities.

230. When Plaintiff resisted allowing a non-ExistX employee to control or interfere with company operations, Defendant Wiltbank criticized her for "creating division" and framed her refusal as a leadership failure.

231. This interference with ExistX's ability to pursue follow-on work under the DFAMS contract was not an isolated incident, but part of a broader pattern in which Defendant Wiltbank required Plaintiff to defer to Galois personnel in matters of business development and operations, even where such deference undermined ExistX's performance and resulted in loss of work and employee layoffs, and directly undermined Plaintiff's ability to perform her responsibilities as CEO by interfering with her authority over business development and contract execution.

232. This pattern of interference and pressure associated with Mr. Miller did not end in 2024. In recorded calls in early 2025, Defendant Wiltbank informed Plaintiff that he had "directed" Mr. Miller, who was not employed by ExistX, to pursue business development efforts on behalf of ExistX without Plaintiff's knowledge or authorization, further demonstrating that Defendants exercised operational control over ExistX while excluding Plaintiff from decisions she was responsible for managing.

233. When Plaintiff resisted that interference and attempted to assert her authority as CEO, her actions were reframed as a lack of "trust" and treated as leadership deficiencies.

234. On November 19, 2024, Defendant Wiltbank sent Plaintiff an email accusing her of being "territorial," stating that she viewed ExistX as separate from "US, a tribe," and dismissing her communication as a "polite blow off."

235. In that same exchange, Defendant Wiltbank criticized Plaintiff for not relying on the advice

and coaching of a list of male Galois personnel.

236.    These statements reflect Defendant Wiltbank's expectation that Plaintiff defer to Galois personnel in operating ExistX and his view that her independent exercise of authority as CEO was improper.

237.    Plaintiff's efforts to enforce boundaries, protect her team, and manage ExistX independently were thus recast as leadership deficiencies.

238.    Defendant Wiltbank continued to challenge Plaintiff's authority in other ways, including her hiring and staffing decisions.

239.    In or around December 2024, Defendant Wiltbank required Plaintiff to submit her selected candidate for Director of Business Development and Capture for his personal review and approval, despite such hiring decisions falling within Plaintiff's authority as CEO.

240.    During his interview with the candidate, a qualified female professional, Defendant Wiltbank stated that he had concerns about ExistX because it had "…an all-female executive team…" and he felt "…they [women] are too democratic to actually make decision and get things done..."

241.    This comment was made in the context of evaluating the candidate's fit within the organization and reflected gender-based scrutiny of ExistX's leadership composition.

242.    At the time, ExistX's leadership team consisted of women.

243.    This was not isolated. For example, in a January 27, 2025, meeting between Plaintiff and Defendant Wiltbank, he characterized Plaintiff's hiring decisions as "opportunistic," specifically referencing her leadership team's names.

244.    At that time, Plaintiff had a diverse team that included both male and female employees; however, Defendant Wiltbank identified only female hires in making this criticism.

245.    He went on to accuse Plaintiff of making these hires without a sufficiently broad search

34

process and implied that Plaintiff selected individuals based on gender rather than merit.

246. These comments were made in the context of discussing Plaintiff's leadership and team composition.

247. When viewed in conjunction with his prior statement in December 2024 expressing concern about an "all-female executive team," this selective criticism reflects a pattern of scrutinizing and devaluing Plaintiff's leadership decisions in a manner tied to gender.

248. This pattern of requiring Plaintiff to defer to Galois personnel while penalizing her independent exercise of authority affected ExistX's operations, personnel decisions, and business development efforts across the company.

249. This pattern was ongoing at the time Plaintiff engaged in protected activity in February and March 2025 and formed the context in which her compliance-related decisions were evaluated, challenged, and ultimately opposed by Defendants.

250. When Plaintiff continued to insist on operating ExistX independently and in compliance with applicable legal requirements, including in connection with the 5STARS licensing issue, Defendants escalated this established pattern by restricting her authority, excluding her from key decision-making, and creating conditions in which she could neither exercise her role as CEO nor proceed lawfully.

251. This escalation culminated in her termination and demonstrates that her authority was conditioned on alignment with Galois leadership rather than her performance or responsibilities as CEO, a pattern that was also reflected in how Defendants evaluated and compensated Plaintiff.

**DEFENDANT'S BREACH OF PAY OBLIGATIONS, INCONSISTENT FEEDBACK AND DISPARATE PAY OF PLAINTIFF**

252. This same pattern of shifting expectations, subjective evaluation, and conditioning Plaintiff's role on "trust" and alignment with Galois leadership was also applied to Plaintiff's compensation and performance evaluation.

253. By early January 2025, Plaintiff had met or exceeded the criteria for her 2024 incentive bonus, tied to the company operating plan for 2024 as agreed to at the January 2023 ExistX Board meeting.

254. The 2024 operating plan and financial framework were based on objective business criteria and did not condition Plaintiff's earned incentive compensation on later-created, subjective concepts such as "organizational leadership," "trust," or "cultural alignment."

255. On January 10, 2025, Plaintiff participated in a call with Defendant Wiltbank and Mr. Boyer reviewing her plan for ExistX employee 2024 bonuses as well as her own, during which she was informed that she would receive her full $50,000 bonus, and potentially more, in light of the Company's strong performance.

256. The following week, on January 16, 2025, was the first ExistX Board meeting of 2025 and with HCP board members and board observer. Plaintiff provided her bonus plan for ExistX staff as well as the recommendation for her own, based on the conversation with Defendant Wiltbank and Mr. Boyer the previous week.

257. Plaintiff was excused from the end of the Board Meeting so they could discuss her executive compensation and incentive bonus for 2024.

258. Defendant Wiltbank called Plaintiff and informed her of the Boards decision to only award her $30,000.

259. When Plaintiff questioned the shortfall, Defendant Wiltbank told her it was because he and the board felt she lacked "organizational leadership."

260. Plaintiff challenged that feedback since that's not what her employment offer letter stated the criteria was for her annual incentive bonus, to which Defendant Wiltbank dismissed the agreement as nonbinding, stating it was "just an offer letter."

261. The reduction therefore marked a deliberate shift away from the company's objective

36

performance-based framework and toward subjective criteria selectively invoked against Plaintiff, tied to her perceived alignment with Defendant Wiltbank and Galois personnel rather than her achievement of business goals.

262. Defendant Wiltbank was not merely a bystander to the compensation shortfall. He personally participated in the compensation discussions preceding the reduction, personally communicated the reduced bonus outcome to Plaintiff, and later imposed additional subjective performance criteria governing her continued role.

263. In text messages on or around January 16, 2025, between Plaintiff and Board Observer, Mr. Hale, he stated that he had "…no idea that this [Plaintiff's bonus] was even a discussion point…" and continued on to say "…The company has cash…you've [Plaintiff] have been a star…"

264. In an exchange with Mr. Boyer, he acknowledged that Plaintiff had been misled by the January 10 discussion with Defendant Wiltbank, confirming that Plaintiff's understanding of that conversation, that she would receive her full bonus, was accurate.

265. The reduction in bonus is also contradicted by inconsistent feedback to Plaintiff. In a January 27, 2025, recorded discussion, Defendant Wiltbank *praised* Plaintiff's 2024 performance and the Company's overall condition, stating that Plaintiff had built "a great fucking team," secured "good contracts," and that "your [Plaintiff] ops are solid," and described ExistX as "a great fucking business."

266. In that same discussion, he distinguished these objective results from what he described as "softer" leadership considerations, stating that "they're two separate things."

267. In this same January 27 discussion, Defendant Wiltbank expressed strong support for Plaintiff's leadership, stating, "…my enthusiasm for what you do and how you see this is why I love you in this role in the first place," and affirming alignment with her strategic direction and

business plan.

268.    This characterization directly conflicted with the justification previously provided for reducing Plaintiff's 2024 bonus and demonstrated that her performance was not the basis for adverse decisions. Instead, Plaintiff's leadership was evaluated according to shifting and subjective criteria tied to her willingness to defer to Defendant Wiltbank and Galois personnel, rather than her achievement of objective business goals.

269.    By contrast, male executives operating within the same decision-making structure were not evaluated using these subjective criteria and were compensated based on objective performance outcomes.

270.    At the February 6, 2025, ExistX Board meeting, Plaintiff, with the encouragement of Board observer Mr. Hale, raised concerns regarding the reduction of her bonus and the inconsistency between that decision and the feedback she had received regarding her performance.

271.    Within days of that Board meeting, during a February 10, 2025 recorded discussion with Plaintiff, Defendant Wiltbank imposed a new, personally designed performance framework, "Shared Reality J," that required Plaintiff to assess and report on metrics tied to pipeline, program execution, hiring, and culture, as well as "trust" status with specific individuals, including individuals outside of ExistX such as Galois personnel and employees of Galois-affiliated companies.

272.    In that same discussion, Defendant Wiltbank stated that he hoped Plaintiff would "…meet [her] marks" under this framework.

273.    The structure positioned Plaintiff to be evaluated solely by Defendant Wiltbank, not only on internal business performance, but also on her perceived level of alignment and "trust" with Galois personnel, subjecting her continued leadership to unilateral, subjective evaluation criteria extending beyond ExistX's operations.

274.    This abrupt reversal in compensation expectations, together with the reliance on subjective

38

and previously unarticulated criteria such as "organizational leadership," caused Plaintiff to question the reliability of Defendant Wiltbank's representations and raised concern regarding her job security.

275.    As a result, she began contemporaneously documenting her one-on-one interactions with Defendant Wiltbank and reviewing the terms of her employment agreement in light of these inconsistencies.

276.    Plaintiff's employment agreement was signed by both parties, contained defined compensation terms, and was relied upon by Plaintiff in accepting and performing her role as CEO.

277.    Defendant Wiltbank nevertheless dismissed the agreement as "just an offer letter" when declining to honor its terms.

278.    This characterization was inconsistent with the parties' execution of the agreement and their course of performance, and was asserted in the same time period as Plaintiff's protected activity and escalation of compliance concerns.

279.    This shift from objective performance-based compensation to subjective, trust-based evaluation criteria mirrors the same pattern applied to Plaintiff's authority and role, and reflects a consistent practice of conditioning Plaintiff's compensation and continued employment on her alignment with Galois leadership rather than her performance as CEO.

**TERMINATION OF PLAINTIFF**

280.    On March 31, 2025, under the pretense of a rescheduled board meeting originally set for March 26, Plaintiff joined the meeting under the impression it would be a routine leadership discussion.

281.    Instead, she was met by Defendant Wiltbank, and ExistX Board Member Mr. Foos, and ExistX Board Observer Mr. Hale, without prior notice or agenda, and was abruptly terminated.

282.    Defendant Wiltbank personally recommended Plaintiff's termination to the Board.

283.    Plaintiff's termination occurred less than four weeks after she refused to authorize proposal

submissions involving 5STARS without documented IP rights, and in the context of escalating pressure, shifting performance expectations, and ongoing interference with her authority as CEO.

284. During the termination call, Plaintiff asked why she was being fired, and Defendant Wiltbank responded, "all the same stuff."

285. Plaintiff had never received any formal notice from the Board that her employment was in jeopardy.

286. The ExistX Board also vested an additional 100,000 shares of equity tied to Plaintiff's successful performance, including closing the $3 million Hale Capital raise, during her termination meeting.

287. This was followed by Mr. Hale, suggesting Plaintiff's termination be framed publicly as "classic tension between cultures" in an effort to control the narrative and optics.

288. Taken together, the timing and circumstances of Plaintiff's termination align directly with her refusal to proceed with a federal submission without documented legal authority, rather than any deficiency in her performance.

289. The sequence of events, including the cessation of licensing work on February 19, 2025, the February 28 directive prohibiting use of 5STARS, Plaintiff's escalation of compliance concerns to the Board, her refusal to proceed without documented rights, and Defendants' subsequent execution of a licensing agreement after her termination, demonstrates that Defendants understood a formal IP license was required. Plaintiff was terminated not because she misunderstood the law, but because she refused to proceed in a manner she reasonably believed would require ExistX to misrepresent its rights to the Government in connection with a federal procurement.

### POST TERMINATION DEFAMATION OF PLAINTIFF

290. On March 31, 2025, just a few hours after Plaintiff was fired as CEO, Defendant Wiltbank

hosted an all-hands to disclose the leadership transition to the ExistX workforce.

291.    Defendant Wiltbank publicly stated Plaintiff's termination was for "lack of trust" and her "IP handling."

292.    This was the first post termination incident of defamation.

293.    These statements were made to third parties, including ExistX employees as well as Galois employees in attendance. The Galois employees included Mr. Miller and Mr. Bauer.

294.    Defendant Wiltbank statements were contemporaneously documented by multiple witnesses and were contemporaneously corroborated by Defendant Wiltbank himself in a recorded April 1, 2025.

295.    Defendant Wiltbank's statement directly ties Plaintiff's termination to her protected activity and contradicts any later characterization as performance.

296.    These statements falsely characterized Plaintiff's conduct as improper and incompetent in connection with federal contracting and the handling of intellectual property, directly impugning her professional competence and integrity in her trade.

297.    Defendant Wiltbank continued to make defamatory statements about Plaintiff post termination.

298.    In a recorded April 17, 2025, call, in a professional setting with multiple ExistX employees and executives whose roles involved business development, technical leadership, and external engagement with government stakeholders, Defendant Wiltbank told other executives that "Janie royally fucked up the response to 5STARS."

299.    This statement was false. Internal communications, including the February 14, 2025, signed memorandum and Darias' contemporaneous emails and text messages, confirm that Plaintiff acted consistently with both the representations of Galois legal counsel and the guidance of the lead technical personnel responsible for the technology.

41

300. This statement was made *after* Defendants were aware of potential litigation, having received notice from Plaintiff's counsel. and referred to Plaintiff's decision not to submit a federal proposal under an OTA following the February 28 withdrawal of authorization to use 5STARS and the absence of any executed IP license.

301. This comment is the Defendants' attempt to recast Plaintiff's protected activity associated with 5STARS as a performance failure and discredit Plaintiff's competence and integrity.

302. These defamatory framing statements reinforced the same "lack of trust" narrative Defendants and aligned Galois staff had been using for months, demonstrating that the defamation was not isolated, but part of a sustained and coordinated effort to undermine her.

303. On April 28, 2025, during a leadership meeting, Defendant Wiltbank told employees, "I don't think we broke the law a single time with respect to 5STARS," despite internal acknowledgments from other executives that no license existed and that they "could not in good conscience pitch it" without one.

304. These repeated false and misleading statements contradicted the documented facts, mischaracterized Plaintiff's lawful refusal as misconduct, and were made with knowledge of their falsity or, at a minimum, with reckless disregard for the truth. These statements were made after Defendants had been placed on legal notice via Plaintiff's counsel, further evidencing actual malice.

305. This pattern continued with a third defamatory statement on or about June 15, 2025, in an ExistX Board meeting that included non-board member ExistX employees. Defendant Wiltbank stated that Plaintiff was suing "…us [ExistX and Galois] because she's a woman."

306. The statement was made in a professional setting to third parties, was heard and contemporaneously documented by multiple attendees, and was repeated during the same meeting by other senior leadership, including Mr. Boyer.

307.    The statement was false and mischaracterized the basis of Plaintiff's claims, which were grounded in her refusal to engage in conduct she reasonably believed would violate federal procurement and data rights requirements. By attributing Plaintiff's claims to her gender, the statement conveyed that her actions were not based on legitimate legal or business concerns. Following the meeting, this characterization was repeated by employees in the ordinary course of business.

308.    These statements were not isolated. Defendant Wiltbank made multiple defamatory statements about Plaintiff following her termination despite Defendants' being on notice of her legal claims.

309.    These statements, taken together, reflect an escalating effort to recast Plaintiff's compliance-driven conduct as misconduct and to undermine her professional credibility. Their repetition over time, including after legal notice, demonstrates that the statements were part of a sustained and coordinated effort rather than isolated remarks.

310.    These statements were made within the national security and federal contracting community, a professional environment in which trust, legal compliance, and the responsible handling of sensitive technology and data are essential to employment. Statements suggesting that Plaintiff mishandled intellectual property, acted without integrity, or lacked trustworthiness directly attack the core qualifications required for leadership roles in that field and constitute defamation per se.

311.    As a result of these statements, Plaintiff's professional reputation was materially damaged during a critical period following her termination, and her ability to pursue comparable executive or cleared positions was significantly impaired. Because the statements impugned her professional competence and integrity, damages are presumed; however, Plaintiff has also suffered actual and ongoing harm as these statements continued through at least June 2025 after Defendants were on

43

notice of her claims, reinforcing and amplifying the damage within the professional community in which she had built her career.

312.    Plaintiff was thereby forced to pursue self-employment in lieu of continuing along her established executive career path, replacing a stable and high-income trajectory with an early-stage venture characterized by delayed, uncertain, and materially reduced earnings. This shift was not voluntary in the ordinary course of career progression but was undertaken in response to reputational harm that made continued employment within Plaintiff's field professionally untenable, resulting in loss of earning capacity and long-term professional opportunity.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of The FALSE CLAIMS ACT RETALIATION (31 U.S.C. § 3730(h))

313.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

314.    Under 31 U.S.C. § 3730(h), an employer may not discharge or otherwise discriminate against an employee because of lawful acts undertaken to investigate, prevent, or stop a violation of the False Claims Act. To establish retaliation, to establish a claim of retaliation under the False Claims Act (FCA), a plaintiff must demonstrate: (1) She engaged in protected activity aimed at investigating, preventing, or stopping a violation of the FCA; (2) her employer knew or should have known of her protected activity; and (3) she suffered an adverse employment action as a result of that activity.

315.    In this case, between November 2023 and March 2025, Plaintiff, as CEO of ExistX, repeatedly identified and opposed conduct she reasonably believed would result in unlawful or noncompliant representations to the federal government. Specifically, Plaintiff consistently warned ExistX's Board of Directors—of the serious legal risks associated with submitting a federal

contract proposals involving Galois-developed technology, including 5STARS, without a valid intellectual property (IP) licensing agreement between ExistX and Galois.

316.    Plaintiff expressly refused to authorize submission of any proposal involving 5STARS absent such a license and escalated these concerns to the Board, including by formally notifying the Board on March 1, 2025, that proceeding without documented rights would violate federal contracting requirements and expose ExistX to liability under the False Claims Act..

317.    On March 3, 2025, Plaintiff convened an emergency Board meeting to reiterate these concerns and confirmed that she would not authorize any proposal involving Galois-owned technology without a valid, written license. On March 10, 2025, Defendant Wiltbank dismissed Plaintiff's concerns as being "risk-averse to a fault" and excluded her from governance discussions.

318.    In the weeks between Plaintiff's formal licensing escalation and her termination, Defendant Wiltbank tightened managerial control, shifted performance evaluation criteria toward subjective measurements such as "trust" and "cultural alignment", participated in slowing or redirecting the licensing process, and later tied Plaintiff's removal to differences in IP handling.

319.    These events are closely temporally linked to Plaintiff's efforts to prevent what she reasonably believed would be fraudulent or noncompliant representations to the government.

320.    On March 31, 2025, less than four weeks after Plaintiff's formal escalation and refusal to proceed without documented rights, Defendants terminated her employment.

321.    The timing and circumstances of Plaintiff's termination establish that her protected activity was a substantial and motivating factor in Defendants' decision. Plaintiff was terminated after refusing to proceed with a federal submission that would have required ExistX to misrepresent its rights to the government, and in the context of escalating pressure to abandon that position.

322.    Defendants' conduct was further retaliatory in that, after Plaintiff's termination, they

proceeded to execute the same intellectual property license that Plaintiff had insisted was required, confirming that Defendants were aware of the necessity of such licensing while opposing Plaintiff's efforts to secure it.

323.   As a direct and proximate result of Defendant's retaliation, Plaintiff suffered substantial damages, including loss of employment, loss of salary, bonuses, and benefits, loss of equity compensation, reputational harm, and emotional distress.

324.   Plaintiff seeks all relief available under 31 U.S.C. § 3730(h), back pay, front pay, unpaid bonuses and benefits in an amount of no less than $500,000, compensatory damages for emotional distress and reputational harm of no less than $500,00, plus punitive damages pursuant to 31 U.S.C. § 3730(h) of not less than $200,000, and attorneys' fees and costs.

## COUNT II

### Violation of the Virginia Whistleblower Protection Act (Va. Code § 40.1-27.3)

325.   Plaintiff references and incorporates all preceding factual allegations in the paragraphs as if fully set forth herein.

326.   Under Va. Code § 40.1-27.3, a plaintiff must show: (1) A good faith report of a violation of federal or state law or regulation; (2) made to a supervisor or public body; and (3) retaliation in response to that report.

327.   Plaintiff engaged in protected activity under the Virginia Whistleblower Protection Act by, in good faith, identifying, reporting, and opposing conduct she reasonably believed would violate federal law, including the False Claims Act and federal procurement regulations governing intellectual property and SBIR data rights.

328.   Specifically, Plaintiff reported to Defendant Robert Wiltbank and the ExistX Board that ExistX could not lawfully submit proposals involving Galois-developed technology, including 5STARS, without a valid intellectual property license, and refused to authorize any such proposal

absent documented legal rights.

329.    Plaintiff escalated these concerns to the Board in early March 2025, including by convening an emergency meeting to address the issue.

330.    Defendants were aware of Plaintiff's protected activity and in direct response, Plaintiff faced escalated hostility, exclusion from governance discussions, and termination.

331.    On March 31, 2025, Defendants terminated Plaintiff's employment.

332.    The timing and context of her firing underscore that her protected activity was a substantial factor in Defendants' decision and that it was its retaliatory in nature.

333.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe financial, reputational, and emotional harm.

334.    Plaintiff requests for this claim, back pay, front pay, and benefits in an amount of no less than $500,000, compensatory damages for emotional distress and reputational harm of no less than $500,00, plus punitive damages of not less than $200,000, and attorneys' fees and costs.

## COUNT III

### Violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d)

335.    Plaintiff references and incorporates all the preceding factual allegations as if fully set forth herein.

336.    To prevail under 29 U.S.C. § 206(d), a plaintiff must show: (1) she received lower compensation than male counterparts; (2) for substantially equal work; and (3) under similar conditions and with similar responsibilities.

337.    Plaintiff performed work requiring substantially equal or greater skill, effort, and responsibility than male comparators. In addition to her CEO duties, Plaintiff personally performed technical, licensing, integration, and compliance-alignment functions overlapping with a CTO role, while retaining ultimate accountability for company performance, fundraising, and

47

enterprise-wide operations.

338.    During Plaintiff's employment, male CTO Mr. Bauer received compensation through a coordinated ExistX and Galois structure that, in total, exceeded Plaintiff's compensation, despite Mr. Bauer occupying a narrower and subordinate role within the same organizational structure.

339.    Following Plaintiff's termination, Defendants further approved and implemented compensation for Ashwin Fisher at a level exceeding Plaintiff's compensation, confirming Defendants' own benchmark for a narrower technical-executive role.

340.    The disparity was not the result of seniority, merit, quantity or quality of production, or any bona fide factor other than sex.

341.    Instead, Defendants applied subjective and inconsistently enforced criteria such as "leadership" and "trust," invoked during Plaintiff's conflict with leadership, while male comparators were compensated more favorably and were not subjected to equivalent compensation reductions or standards.

342.    In January 2025, despite having met all performance goals and substantially increasing ExistX's revenue and valuation, Plaintiff received only a $30,000 bonus instead of the $50,000 she was contractually owed.

343.    Wiltbank explicitly dismissed her entitlement by claiming the contract was merely an "offer letter."

344.    The company's refusal to honor her performance bonus while treating male executives more favorably supports a prima facie case under the Equal Pay Act.

345.    Male executives such as Mr. Bauer and Mr. Fisher within ExistX or Galois with similar responsibilities were not subject to arbitrary reinterpretation of their compensation agreements.

346.    Plaintiff requests for this claim, unpaid wages of no less than $20,000, liquidated damages of $20,000, plus pre and post judgement interest, and attorney's fees and costs.

## COUNT IV

### Breach of Contract

347.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

348.    For a breach of contract claim a plaintiff must prove: (1) a valid contract existed; (2) the defendant breached that contract; and (3) the plaintiff suffered damages as a result.

349.    Plaintiff signed a written agreement on September 12, 2023, which specified Plaintiff's salary, bonus structure, stock options, benefits, and board seat.

350.    Under both Virginia and federal law, the offer letter constitutes a valid and binding employment contract.

351.    She fully performed her contractual obligations, including achieving revenue, compliance, and valuation milestones.

352.    Nevertheless, Defendants failed to pay the full performance bonus and denied the enforceability of the contract, causing significant financial harm.

353.    Plaintiff requests for this claim, the contractually obligated payment of her bonus in an amount of no less than $20,000, payment of $580,800 as a value of equity loss based on $12M post-raise valuation and 4.84% diluted stake (7% pre-dilution), and lost benefits and consequential damages in an amount of no less than $100,000, plus pre and post judgment interest, and attorney's fees and costs.

## COUNT V

### Common Law Defamation

354.    Plaintiff references and incorporates all the factual allegations in the preceding paragraphs as if fully restated herein.

355.    To prevail under Virginia defamation law, Plaintiff must establish: (1) the defendant

49

published a false statement of fact; (2) about the plaintiff to a third party; (3) that was made negligently or maliciously; and (4) that caused reputational or economic harm.

356. Following Plaintiff's termination, Defendant Wiltbank made false statements of fact about Plaintiff to ExistX and Galois personnel including that Plaintiff was 'grabby' and 'overreaching' with respect to IP, said she had 'royally fucked up the response to 5STARS,' and stated, 'I don't think we broke the law a single time with respect to 5STARS,' all while falsely portraying Plaintiff's insistence on formal licensing compliance as misconduct.

357. Further, Defendant Wiltbank has continued to make defamatory comments about Plaintiff to others in the federal contracting community.

358. These statements directly contradicted her documented efforts to secure legal compliance and were made with knowledge of their falsity.

359. The statements were made with knowledge of their falsity or, at a minimum, with reckless disregard for the truth, and were intended to and did in fact harm Plaintiff's professional standing, particularly in the small and reputation-sensitive federal contracting community.

360. These statements constitute defamation per se in that they impute professional incompetence and misconduct in Plaintiff's trade and profession.

361. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe financial, reputational, and emotional harm.

362. Plaintiff requests for this claim, compensatory damages in an amount of no less than $300,000 for emotional distress and reputational harm, consequential damages of not less than $500,000 as a result of the lost employment and business opportunities, and punitive damages of no less than $500,000 for malice and reckless disregard of the truth, plus attorney's fees and costs.

## COUNT VI

### Wrongful Termination in Violation of Public Policy (Bowman Claim)

50

363.   Plaintiff references and incorporates all factual allegations in the preceding paragraphs as if fully restated herein.

364.   Under Virginia law, Virginia recognizes a common-law wrongful discharge claim where an employee is terminated in violation of a public policy expressly stated in a Virginia statute. Under Bowman and its progeny, a claim may arise where an employee is discharged for refusing to engage in an unlawful act or where the discharge violates a public policy expressly embodied in a Virginia statute.

365.   The Virginia public policy implicated here is the Commonwealth's policy favoring honesty, fairness, impartiality, and avoidance of impropriety in public procurement, as expressed in the Virginia Public Procurement Act, Va. Code § 2.2-4300 et seq., which provides that public procurement should be conducted in a fair and impartial manner with avoidance of impropriety or the appearance of impropriety.

366.   Plaintiff was within the class of persons protected by this public policy because, as CEO of ExistX and as the executive responsible for compliance, security, and government-facing contracting activity, she was responsible for ensuring that ExistX did not make false, misleading, or improper representations in connection with government procurement activity.

367.   Plaintiff repeatedly refused to participate in, authorize, or conceal proposals or procurement activity that would misrepresent ExistX's legal rights to use Galois-owned or Galois-developed technology, including 5STARS, without an executed intellectual property license. Plaintiff warned ExistX's Board and Defendant Wiltbank that moving forward without a formal IP license would misstate ExistX's legal rights, create procurement-integrity problems, and expose ExistX to legal and regulatory risk.

368.   Plaintiff's refusal to proceed without documented rights was not a mere business disagreement. It was a refusal to participate in procurement-related misrepresentation and a refusal

51

to engage in conduct contrary to Virginia's clearly expressed public policy requiring honesty, fairness, and avoidance of impropriety in procurement.

369.	Defendants knew of Plaintiff's refusal and her stated compliance concerns. Plaintiff raised the issue repeatedly, requested formal documentation of ExistX's rights, convened an emergency board meeting, and explained that ExistX could not truthfully and lawfully proceed with proposals involving 5STARS or other Galois technology without an executed license.

370.	Defendants terminated Plaintiff on March 31, 2025, under pretextual rationales including "not a culture fit," "lack of trust," and "differences on IP." The true reason for Plaintiff's termination was her refusal to participate in procurement-related misrepresentation and her insistence that ExistX comply with procurement-integrity requirements before pursuing government opportunities involving Galois technology.

371.	Plaintiff's termination therefore violates Virginia public policy as expressed in the Virginia Public Procurement Act and falls within Bowman exceptions for discharge in violation of an express Virginia statutory public policy and discharge for refusing to engage in unlawful or improper conduct.

372.	As a direct and proximate result of Defendants' wrongful termination, Plaintiff suffered economic losses, loss of compensation and benefits, reputational harm, loss of career opportunities, emotional distress, and other damages.

373.	Plaintiff demands judgment against Defendants, jointly and severally, for back pay, front pay, compensatory damages, punitive damages, costs, pre- and post-judgment interest, and such further relief as the Court deems just and proper.

### Count VII

### <u>Title VII Sex Discrimination (42 U.S.C. § 2000e-2(a))</u>

374.	Plaintiff references and incorporates all preceding paragraphs as if fully restated herein.

375. At all relevant times, Plaintiff was a woman and therefore a member of a protected class under Title VII.

376. At all relevant times, ExistX and Galois were Plaintiff's employers and/or joint employers within the meaning of Title VII.

377. Title VII prohibits an employer from discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's sex.

378. Defendants discriminated against Plaintiff because of her sex.

379. Among other things, Defendants, acting through Defendant Wiltbank and other decisionmakers, subjected Plaintiff to gender-based remarks, stereotypes, and assumptions about women in leadership; questioned and undermined her hiring decisions when they involved qualified women; expressed concern about Plaintiff "hiring a lot of women"; suggested that clients would not want to work with "all women"; required Plaintiff's decisions and female hires to be vetted by male Galois personnel; imposed heightened scrutiny on Plaintiff not applied to male executives; diminished her authority and excluded her from key decision-making; withheld a portion of her earned compensation; and ultimately terminated her employment.

380. Defendants' conduct adversely affected Plaintiff's compensation and the terms, conditions, and privileges of her employment, including but not limited to her authority as CEO, her compensation, her standing within the company, and her continued employment.

381. Similarly situated male executives were not subjected to the same sex-based scrutiny, stereotyping, undermining, or disparate treatment.

382. Male executives such as Mr. Bauer and Mr. Fisher with narrower technical roles were compensated at equal or higher levels than Plaintiff, including through coordinated compensation structures controlled by the same centralized decisionmakers. Plaintiff, by contrast, was subjected to subjective critiques of "leadership" and trust, had a portion of her compensation withheld, and

53

was evaluated under standards not applied in the same manner to male comparators. This disparate treatment in compensation, evaluation, and oversight was because of sex.

383. Any reasons later offered by Defendants for Plaintiff's diminished authority, reduced compensation, or termination were not the true reasons, but were instead pretext for unlawful sex discrimination.

384. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered loss of compensation and benefits, loss of employment, emotional distress, humiliation, reputational harm, and other pecuniary and non-pecuniary damages.

385. Plaintiff is entitled to all relief available under Title VII, including back pay, front pay, compensatory damages, punitive damages to the extent permitted by law, equitable relief, attorneys' fees, costs, and pre- and post-judgment interest.

## Count VIII

### Title VII Retaliation (42 U.S.C. § 2000e-3(a))

386. Plaintiff references and incorporates all preceding paragraphs as if fully restated herein.

387. Title VII prohibits an employer from retaliating against an employee because she opposed practices made unlawful by Title VII.

388. Plaintiff engaged in protected activity under Title VII by opposing sex discrimination and sex-based harassment in the workplace.

389. Among other things, Plaintiff advocated for gender equity in hiring and promotions, opposed and reported discriminatory treatment toward women employees, enforced professional standards in response to harassment complaints, objected to disparate treatment in compensation, evaluation, and oversight compared to male executives, and resisted sex-based interference with her authority and leadership.

390.    Defendants knew of Plaintiff's protected activity because Plaintiff raised these matters directly with leadership and board-level decisionmakers, including Defendant Wiltbank, and because Plaintiff acted on complaints involving discriminatory and harassing conduct toward women employees.

391.    Defendant Wiltbank also personally linked compensation, opportunity, and standing within the organization to subjective trust and alignment measures that he controlled, and he used those same measures after Plaintiff objected to discriminatory treatment and acted on harassment concerns.

392.    This supports the inference that the adverse treatment Plaintiff experienced was not merely coincidental, but retaliatory.

393.    After and because Plaintiff engaged in protected activity, Defendants retaliated against her.

394.    Defendants also retaliated against Plaintiff by reducing or constraining her compensation through subjective "leadership" and "trust" criteria during the same period in which Plaintiff opposed discriminatory treatment and acted on harassment complaints. Those criteria were not applied comparably to male executives, and the timing of those compensation actions further reflects retaliatory motive.

395.    Such retaliation included, among other things, escalating scrutiny of Plaintiff; undermining her authority in front of others; excluding her from governance and strategic decision-making; criticizing her in sex-based and stereotyped terms; withholding a portion of compensation she had earned; terminating her employment; and, after termination, making disparaging statements about Plaintiff in order to damage her professional reputation and impair her ability to secure future employment opportunities.

396.    Defendants' retaliatory conduct would dissuade a reasonable employee from opposing unlawful discrimination or harassment.

55

397.    There is a direct causal connection between Plaintiff's protected activity and the adverse actions taken against her. Defendants' hostility toward Plaintiff increased after she opposed discriminatory treatment and responded to harassment complaints, and Defendants' stated reasons for their actions were pretextual.

398.    As a direct and proximate result of Defendants' retaliation, Plaintiff suffered loss of compensation and benefits, loss of employment, emotional distress, reputational harm, and other economic and non-economic damages.

399.    Plaintiff is entitled to all relief available under Title VII, including back pay, front pay, compensatory damages, punitive damages to the extent permitted by law, equitable relief, attorneys' fees, costs, and pre- and post-judgment interest.

### Count IX

### <u>Title VII Hostile Work Environment</u>

400.    Plaintiff references and incorporates all preceding paragraphs as if fully restated herein.

401.    Title VII prohibits discrimination with respect to the terms, conditions, and privileges of employment because of sex, including subjecting an employee to a hostile work environment because of sex.

402.    During her employment, Plaintiff was subjected to unwelcome conduct because of her sex. That conduct included repeated gender-based remarks and stereotypes about women working together and women in leadership; criticism of an "all-female" executive team,  repeated questioning and undermining of Plaintiff's judgment because she was a female executive; requirements that Plaintiff's authority and hiring choices be validated by male personnel; sexist criticism of Plaintiff's leadership style; public erosion of Plaintiff's credibility; differential scrutiny not applied to male executives; and Defendants' failure to meaningfully address harassment and discriminatory conduct directed toward women employees after complaints were

raised.

403.     The conduct was based on sex and reflected discriminatory assumptions about women's credibility, leadership, judgment, and ability to manage other women in the workplace.

404.     The conduct was severe and pervasive, occurring repeatedly over time, publicly undermining Plaintiff's authority, interfering with her ability to perform her role as CEO, and created an intimidating, hostile, and abusive working environment.

405.     Plaintiff subjectively perceived the environment to be hostile and abusive, and a reasonable person in Plaintiff's position would have found the environment hostile and abusive.

406.     The hostile work environment is imputable to Defendants. Wiltbank, a principal decision maker, personally engaged in and advanced the conduct. In addition, Defendants knew or should have known of the discriminatory and harassing conduct through Plaintiff's own complaints and the complaints raised by others, including complaints regarding harassment of women employees, yet failed to take prompt and effective remedial action. Instead, Defendants downplayed the complaints, refused to implement meaningful corrective measures, and retaliated against Plaintiff for attempting to enforce professional standards and protect employees.

407.     As a direct and proximate result of the hostile work environment, Plaintiff suffered emotional distress, humiliation, reputational harm, damage to her professional standing, and other economic and non-economic damages.

408.     Plaintiff is entitled to all relief available under Title VII, including compensatory damages, punitive damages to the extent permitted by law, equitable relief, attorneys' fees, costs, and pre- and post-judgment interest.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter an Order providing for:

   A. Defendant to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any

and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, bonuses, stock options, pay increases, insurance, and benefits pursuant to the False Claims Act, Equal Pay Act, the Virginia Whistleblower Protection Act, Title VII, breach of contract and defamation.

B.  Punitive damages and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C.  Other equitable and legal relief as the Court deems just, proper, and appropriate (including, but not limited to, damages for emotional distress, reputational damage, and pain and suffering).

D.  Costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and Virginia law.

E.  Pre- and post-judgment interest; and

F.  Plaintiff to be given a jury trial as demanded in the caption of the instant Complaint.

### JURY DEMAND

Plaintiff demands a jury trial on claims so triable.

Respectfully submitted,

_/s/ Thomas J. Curcio_____
Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

58

s/ Pamela M. Keith
Pamela M. Keith (Pro Hac)
Raymond K. Gordineer Jr. (Pro Hac)
Center For Employment Justice, LLC
650 Massachusetts Ave. NW
Suite 600
818-800-0292
pamkeith@centerforemploymentjustice.com
raygordineer@centerforemploymentjustice.com

***Attorneys for Plaintiff***