THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| LAURA JANE ROBINSON, | ) | |
| | ) | CIVIL ACTION |
| | ) | |
| *Plaintiff*, | ) | Case No. 1:25-cv-01524-RDA-LRV |
| | ) | |
| v. | ) | |
| | ) | |
| EXIST X., INC., et al. | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO
DEFENDANTS' RULE 12(b)(6)
PARTIAL MOTION TO DISMISS**

Plaintiff Laura Jane Robinson, by and through undersigned counsel, hereby submits her

opposition to Defendants' Partial Motion to Dismiss. Plaintiff does not oppose dismissal of Counts

I, II, VII, VIII, and IX for Robert Wiltbank and solely to the extent those counts are construed as

seeking individual-capacity liability against Robert Wiltbank. The Motion should otherwise be

denied.

**INTRODUCTION**

This case concerns assertions by Plaintiff of violations under the False Claims Act, the

Whistleblower Protection Act, Equal Pay Act, Breach of Contract, Title VII, the Virginia Human

Rights Act and other related Virginia statutory and common law, arising from a sustained course

of retaliation and post-termination defamation by ExistX, Inc. ("ExistX"), Galois, Inc. ("Galois"),

and Robert Wiltbank ("Wiltbank"). Defendants seek to dismiss Plaintiff's Count III, for Violation

of the Equal Pay Act of 1963, Count V, for common law defamation, and Count VI, for Wrongful

Termination in Violation of Public Policy. Additionally, Defendants seek to dismiss Plaintiff's

1

claims under the False Claims Act (Count I), the Virginia Whistleblower Protection Act (Count II), for Breach of Contract (Count IV), and under Title VII (Counts VII to IX) as to Defendant Wiltbank specifically.

Defendants' Motion asks the Court to decide disputed facts and affirmative defenses on the pleadings. It asks the Court to decide, from titles alone, that the Chief Executive Officer who alleges that she also performed the company's technical, licensing, integration, and compliance functions could not have performed substantially equal work to the male technical executives whom the same decisionmakers paid more. It asks the Court to strip repeated statements about Plaintiff's "lack of trust," "IP handling," and alleged mishandling of the 5STARS response from the professional context in which they were made, and then to adjudicate qualified privilege and malice without a record. And it asks the Court to dismiss a Virginia public-policy claim with prejudice even though the First Amended Complaint identifies an express statutory declaration of procurement policy, while the authorities Defendants cite do not address that statute in the *Bowman* context.

Rule 12(b)(6) does not permit such merits determinations at this stage. The First Amended Complaint identifies the decisionmakers, comparators, compensation figures, overlapping job content, statements, speakers, audiences, timing, context, falsity, and facts supporting malice. Those allegations provide far more than fair notice. Accepted as true and viewed together, they plausibly state claims under the Equal Pay Act and Virginia defamation law. Count VI likewise should not be dismissed with prejudice: the Virginia Public Procurement Act expressly declares a public policy of fair, impartial, open procurement free from impropriety, and unlike the remedial statutes at issue in Defendants' exclusivity cases, it supplies no remedy for retaliatory discharge.

The Court should therefore deny the Motion as to Counts III, V, and VI. If the Court concludes that Count VI requires a more precise statutory nexus, the proper disposition is leave to amend—not dismissal. Plaintiff's limited clarification regarding the individual-capacity claims does not affect the liability of ExistX or Galois, the relevance of Wiltbank's conduct and knowledge as their decisionmaker, or the claims asserted directly against him that are not subject to Defendants' individual-liability argument.

## FACTUAL BACKGROUND

On or about September 11, 2023, ExistX extended Plaintiff a written offer of employment for the position of Chief Executive Officer. Amend. Compl. ¶ 34. The offer letter provided, among other things: an annual base salary of $260,000; an "annual incentive bonus of $50,000 in 2024 and $100,000 in 2025 and for each year thereafter"; a grant of 700,000 shares of ExistX stock (representing 7% of the company), subject to milestones; and eligibility for a full suite of employee benefits. *See* Amend. Compl. ¶¶ 35-36. Plaintiff alleges that the Offer Letter set forth final, binding terms of a valid employment contract, which she accepted and on which she relied when she began performing her duties. *Id.* ¶¶ 35–39, 349-352. Plaintiff signed the Offer Letter on September 12, 2023; Defendant Robert Wiltbank signed as well. *Id.* ¶¶ 38-39.

Plaintiff served as ExistX's CEO and a member of its board of directors from September 2023, until her unlawful and retaliatory termination on March 31, 2025. Throughout her tenure, Plaintiff experienced discriminatory pay practices when compared to her male colleagues. Amend. Compl. ¶¶ 268-269. Plaintiff's leadership, and therefore her compensation, was evaluated according to shifting and subjective criteria tied to her willingness to defer to Defendant Wiltbank and Galois personnel, rather than her achievement of objective business goals. *Id.* ¶ 268. By contrast, male executives operating within the same decision-making structure were not evaluated

3

using these subjective criteria and were compensated based on objective performance outcomes. *Id*. ¶ 269.

After her initial hiring, Plaintiff raised various concerns about the company's handling of Intellectual Property licenses, and potential compliance issues that mishandling could raise. Amend. Compl. ¶¶ 51-52, 57-59, 159. For example, Plaintiff led a change in ExistX's IT system, bringing ExistX's systems into alignment with federal security requirements. *See* Amend. Compl. ¶¶ 71-72. This transition received frustration from Defendant Wiltbank. *Id.* ¶ 73. His response marked the beginning of a broader pattern of resistance to Plaintiff's efforts to meet her legal obligations under federal security regulations. *Id.* ¶¶ 73-75.

Plaintiff's IP and federal compliance concerns came to a head with the proposed procurement of a new government contract for Defendant Galois in January 2026, where Defendant represented that they would be operationalizing their technology, 5STARS, in partnership with ExistX. *Id*. ¶¶ 166-169. On January 16, 2025, Galois, through Defendant Wiltbank, represented their intention to move forward with the contract without a formal licensing agreement, placing any contract at immediate risk of non-compliance with federal regulations. *Id.* Following the cessation of IP licensing efforts, Plaintiff expressed to the board of directors that she would not authorize the submission of any contract proposal without a valid IP license, and that she would not be party to false representations to the government. *Id*. ¶¶ 190-193. Within one month, Plaintiff was wrongfully terminated from her position and the personnel remaining at the company were instructed to continue with 5STARS proposals. *Id*. ¶ 197.

Following her termination, Plaintiff alleges that Defendant Wiltbank told ExistX and Galois personnel that she was "untrustworthy" and had mismanaged IP issues, and continued to make similar statements to others in the federal contracting community, severely damaging her

4

reputation and career prospects. Amend. Compl. ¶¶ 290-294. In a meeting with ExistX employees and executives on April 17, 2026, after Defendants were aware of potential litigation, Defendant Wiltbank stated that "Janie royally fucked up the response to 5STARS," and continued to make false and misleading representations about Plaintiffs performance as CEO of ExistX. *Id*. ¶¶ 298, 300-306.

Plaintiff initiated this action on September 11, 2025. In the initial Complaint, Plaintiff clearly expressed her intent to seek leave to amend to add claims under Title VII of the Civil Rights Act of 1964, the Virginia Human Rights Act, and related retaliation claims pending exhaustion of administrative remedies. The EEOC issued a Notice of Rights to Sue on February 3, 2026. Following the exhaustion of administrative remedies, Plaintiff filed her First Amended Complaint (FAC) including the above claims on April 4, 2026. Defendants filed their Partial Motion to Dismiss on June 23, 2026. A Consent Motion for Enlargement of Time to Respond to Defendants' Partial Motion to Dismiss was granted, placing Plaintiff's due date for a response on July 21, 2026.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). When reviewing such a motion, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). A complaint survives when it alleges facts that, if accepted as true, state a facially plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to give the defendant fair notice of the claim and its grounds. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim survives a motion to dismiss if it is "plausible on its face," meaning that the complaint contains enough factual matter, accepted as true, to suggest that the plaintiff is entitled to relief. *Twombly*, 550 U.S. at 570. The plausibility standard does not impose a probability requirement; rather, it merely asks for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678. Importantly, at this stage, the court's function is not to weigh the evidence, resolve factual disputes, or make credibility determinations. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). As shown herein, Plaintiff's allegations, taken as true and viewed under the appropriate standards of review, state plausible claims, which requires the Court to DENY Defendant's effort to dismiss in its entirety.

## ARGUMENT

### I.    THE FIRST AMENDED COMPLAINT SATISFIES RULE 8 AND RULE 12(B)(6), WHILE THE DEFENDANTS' MOTION CONSISTENTLY AND IMPROPERLY IMPORTS MERITS BURDENS INTO THE PLEADING STAGE

Rule 8(a)(2) requires a complaint to provide a short and plain statement showing that the plaintiff is entitled to relief. It does not require the complaint to contain the evidence by which each allegation will later be proved, to establish an evidentiary *prima facie* case, to negate potential defenses, or to satisfy burdens reserved for summary judgment or trial. Rule 12(b)(6) enforces that pleading requirement by asking whether the well-pleaded facts, accepted as true and viewed with all reasonable inferences in Plaintiff's favor, state a plausible claim. It does not authorize the Court to decide which party's factual account is more persuasive, or which explanation is more likely to

prevail after discovery. Fed. R. Civ. P. 8(a)(2), 12(b)(6); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017).

The FAC exceeds this burden. It identifies the relevant decisionmakers, the compensation paid to Plaintiff and the identified male comparator executives, the actual functions performed in their respective positions, the challenged employment decisions, the allegedly defamatory words, the speakers and audiences, the circumstances supporting falsity and malice, the protected conduct preceding Plaintiff's termination, and the public policy alleged to have been violated. Amend. Compl. ¶¶ 99–104, 161–165, 178–187, 190-202, 268–272, 288–289, 298–306, 344–346, 364–366.

Defendants' ability to quote those allegations, identify the comparators, reconstruct the compensation decisions, parse the challenged statements, assert a privilege based on particular audiences, and contest the statutory basis for Count VI confirms that the Plaintiff's FAC provides fair notice. Defendants do not identify a claim they cannot understand. They dispute what the pleaded facts mean and whether Plaintiff can ultimately prove them. Throughout Defendants' arguments supporting their Partial Motion to Dismiss, Defendants rely upon the reasoning of cases from an inapplicable procedural posture, making arguments based on evidentiary merits not required under 12(b)(6). They assert arguments that can only be resolved at a later stage in this case, importing unfair and unmeritorious burdens upon Plaintiff. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint, so it is crucial that this motion is met with the appropriate standard of review under Rule 8(8)(2) to avoid placing too high of a burden on Plaintiff. *See Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); Fed. R. Civ. P. 8(a)(2), 12(b)(6). The various arguments made by Defendants that test the merits of facts and claims alleged in Plaintiff's FAC go beyond the scope of a Rule 12(b)(6) motion.

7

This problem of asking for a heightened approach persists throughout the entirety of Defendants' argument, and they place important merit burdens onto Plaintiff in the pleading stage. On the Equal Pay Act claim, Defendants ask the Court to resolve from titles and their own description of the positions whether Plaintiff and the male executives performed substantially equal work, despite allegations of overlapping technical, licensing, product, integration, and compliance duties, centralized compensation control, and specific pay disparities. On defamation, they ask the Court to isolate selected words from their professional context, presume a qualified privilege for every recipient, and require evidentiary proof of falsity, malice, and abuse of privilege at the pleading stage. On Count VI, they treat the absence of a reported decision applying the precise statutory theory as though Rule 8 requires an already-approved cause of action. Rule 8 imposes none of those burdens. It requires sufficient facts to make the claims plausible, not proof of job equivalency, authentication of recordings, clear-and-convincing evidence of malice, or precedent addressing the identical statutory theory. Those disputed factual and legal issues may be tested on a developed record, but they do not render the Plaintiff's FAC deficient under Rule 12(b)(6).

Accordingly, this Court should deny Defendants' arguments in support of the Motion to Dismiss.

## II.    COUNT III PLAUSIBLY ALLEGES AN EQUAL PAY VIOLATION

### A.    Defendants conflate the proof-stage *prima facie* showing with a Pleading Requirement

Defendants' argument against the EPA violation opens with "to prove" signaling in the first two words that they are attempting to introduce a higher burden than is required at a pleading stage. The first case they cite, *Spencer v. Virginia State Univ.*, 919 F.3d 199 (4th Cir. 2019), was

decided on appeal after a decision on a Motion for Summary Judgment. By reading just the beginning of the case brief you can see that the decision was made after a fully developed record of discovery occurred. *Spencer v. Virginia State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019). Defendants continue this and in fact ALL the cases cited in this section of their argument are in a post-pleading posture. *Wheatley v. Wicomico Cnty., Maryland*, 390 F.3d 328 (4th Cir. 2004) (On appeal, Motion for Judgment as a Matter of Law); *Polak v. Virginia Dep't of Env't Quality*, 57 F.4th 426, 428 (4th Cir. 2023) (On appeal, Motion for Summary Judgment); and *Lee v. Belvac Prod. Mach., Inc.*, No. 20-1805, 2022 WL 4996507, at *1 (4th Cir. Oct. 4, 2022) (An unpublished opinion on appeal, Motion for Summary Judgment).

To suggest that Plaintiff's claims should be treated similarly to any of those cases is against the principles of Rule 8 and the requirements of the pleading stage. It would be patently unfair to make a decision in this case where no discovery has occurred as compared to the cases cited which were decided on a fully developed record.

Defendant's argument is wrongheaded because a plaintiff need not plead, let alone prove, an evidentiary *prima facie* case to survive Rule 12(b)(6). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 506-507 (2002); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). The prima facie framework supplies a method of proof, not a heightened pleading standard. *Id*. Thus, at this stage Plaintiff need not attach payroll records, quantify every task performed by each executive, or prove the relative skill, effort, and responsibility of the positions in her complaint. She must allege facts that, accepted as true, plausibly support the statutory requirements: an opposite-sex wage disparity for substantially equal work under similar working conditions. Plaintiff's FAC meets the correct standard.  Thus, the EPA claim should not be dismissed and

9

Plaintiff should be given the same opportunity to develop a factual record that was granted to the plaintiffs in the cases cited in Defendants' Motion.

### B.  The FAC plausibly alleges each statutory requirement.

Contrary to Defendant's assertions, Plaintiff properly alleges specific opposite-sex wage disparities. Plaintiff's evidentiary burden once a record is established is outlined in _Hodge v. Bos. Mkt. Corp._, 576 F. Supp. 3d 379, 389 (E.D. Va. 2021).  In that case, the court noted: "In order to satisfy this element of a prima face case of discrimination, "a plaintiff does not need to be identical to a comparator-employee;" however, "there must be substantial similarity." _See id._ (citing Rayyan v. Va. DOT, No. 1:15cv01681, 2017 WL 123442, at *3, 2017 U.S. Dist. LEXIS 5061, at *9 (E.D. Va. Jan. 12, 2017) (citing _Haywood v. Locke_, 387 F. App'x 355, 359 (4th Cir. 2010)).  The facts alleged, if proved, would clearly meet this "substantial similarity" standard.

One of the male comparators identified by Plaintiff, Mr. Bauer, allegedly received approximately $295,000 annually, while Plaintiff's base salary began at $260,000 and was $275,000 at termination. Amend. Compl. ¶¶ 42, 102. Another male comparator, Mr. Fisher allegedly received approximately $300,000 in salary plus a $75,000 annual bonus, while Plaintiff received a lower salary and only $30,000 of the $50,000 performance bonus she alleges she earned. _Id._ ¶¶ 42, 103, 253–269, 342. Those are identified male comparators and quantified compensation components, not a hypothetical disparity.

Plaintiff also alleges "substantially similarity" based on actual content: technical strategy, product direction, licensing, solution ideation, integration, and compliance functions performed within the same executive operation. _Id._ ¶¶ 100–104, 337–345. Finally, she alleges similar working conditions and centralized compensation control within the integrated ExistX–Galois structure, including the same actors setting, adjusting, and overriding executive compensation. _Id._ ¶¶ 91–99.

To the extent Defendants dispute whether the integrated structure constitutes the relevant establishment or whether Mr. Bauer's Galois work materially changes the comparison, those issues likewise depend on facts concerning centralized wage setting, functional integration, and actual performance.[1]

The bonus allegations also constitute a cognizable wage disparity as well. "Wages" include salary and bonuses, and the Act measures the rate at which each form of compensation is paid rather than allowing disparate components to disappear into a total-remuneration calculation. 29 C.F.R. § 1620.10; *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 655 (4th Cir. 2021). Thus, the alleged reduction of Plaintiff's earned bonus and the more favorable bonus rate approved for male comparators are relevant components of the pleaded wage differential.

Taken together, the allegations permit a reasonable inference that the same decisionmakers paid male technical executives more for a substantially equal common core of work, while the lower-paid female CEO carried additional enterprise-wide responsibility. Discovery may ultimately show material differences sufficient to defeat Count III. Rule 12(b)(6) does not permit the Court to make that evidentiary finding now. The Motion should be denied as to the Equal Pay Act claim.

**C.      Defendant incorrectly contends that Plaintiff's comparators are insufficient to show a disparity in pay under the Equal Protection Act.**

Defendants assert that the Court is bound by a strict requirement that the work be "virtually identical" for the protections set out in the Equal Pay Act to apply. However, as previously pointed out, all the authorities Defendants rely upon for this assertion are decisions based either on a

---

[1] Defendants appear to refute this purported structure throughout their arguments but then in their argument against defamation contends that the Galois employees shared a common interest and attempt to claim "qualified privilege," which cannot be true unless the joint-employer theory presented by Plaintiff is true.

11

Motion for Summary Judgment or a Motion for a Judgment as a Matter of Law, and therefore represent a significantly higher threshold than that required by Rule 12(b)(6).

Additionally, each of the authorities cited by Defendants involve cases where the plaintiffs were in positions roughly lateral or lower in their organization than the comparators used. *See Polak*, 57 F.4th at 430-32(explaining that the plaintiff and the comparator held the same job title, but the comparator had greater responsibilities within his role); *Wheatley*, 390 F.3d at 330. The Court has long held that EPA claims do not fail because of the absence of a "perfect male comparator," but because a factor-by-factor analysis shows unequal responsibilities between the two parties. *See Wheatley*, 390 F.3d at 334 ("We do not suggest that … action faltered because it failed to identify one specific individual who constitutes a perfect male comparator"). In *Wheatley v. Wicomico*, both the plaintiff and the comparator held the same job title, however, the Court found that their responsibilities within the job were substantially different. *See* 390 F.3d at 333 (holding that the comparator had more specialized skills than the plaintiff, and therefore, their jobs were not comparable despite having the same job title"). The reasoning given by the Court was that, where responsibilities differ, the plaintiff could not prove that the comparator did not have additional or specialized tasks warranting the higher pay. *Id.* ("jobs are considered unequal—despite having the same general core responsibilities—"if the more highly paid job involves additional tasks").  None of Defendants' authorities dealt with a Plaintiff who was at in a higher position at the company and receiving less compensation than the comparator, but was compensated less. The Wheatley Court's point was that the analysis is designed to ascertain if there is some plausible explanation for the differences in pay.  Where the comparator has different duties, more duties, substantially more experience, or specialized skills, pay differences may be justified.  But where the comparator

12

makes more money, but either has the same or fewer duties and skills, higher pay is not justified or rational.

Plaintiff held the title of CEO for ExistX, and was very effective in her position, greatly increasing the organization's revenue and valuation. *See* Amend. Compl. ¶¶ 42, 342. Plaintiff performed additional, specialized tasks in technical, licensing, integration, and compliance-alignment functions that overlapped with the role of CTO. *Id.* ¶ 337. On the other hand, Plaintiff's primary comparators were Mr. Fisher and Mr. Bauer, who both held *subordinate roles* with fewer duties and responsibilities within the company's structure than Plaintiff. *Id.* ¶¶ 338, 345. Mr. Bauer performed fractional CTO duties and held a subordinate and narrower position than Plaintiff within the organizational structure. *Id.* ¶ 338. Despite holding a smaller role within the organization, Mr. Bauer was consistently compensated at a higher level than Plaintiff. *Id.* ¶ 338. The other comparator identified, Mr. Fisher, held the sole title of CTO, a narrower title than that held by Plaintiff, and did not perform additional tasks outside of his role, yet he was never subject to the same compensation reductions or standards faced by Plaintiff, and he was compensated at a level exceeding Plaintiff's. *Id.* ¶¶ 339, 341. These disparities in compensation and dispensation of promised benefits were not the result of seniority, merit, quality of production, or any factor other than sex.

Courts have acknowledged that finding a completely identical comparator is not feasible for the majority of cases. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223-224 ("[T]his Court has emphasized that a comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances"(internal quotation marks, ellipsis, and brackets omitted)). In the absence of an "identical comparator," the Fourth Circuit has used a factor-by-factor, or practical comparator

13

analysis to show equality in these instances. *See Wheatley*, 390 F.3d at 334 ("The comparison to the male employee has to be made 'factor by factor'"); *Haynes*, 922 F.3d at 223-224 ("to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct" (internal quotation marks, ellipsis, and brackets omitted)). Comparing Plaintiff's compensation to male employees who are also in executive roles, but hold narrower and subordinate positions, is sufficient to establish that Plaintiff had equal or greater responsibilities than those male colleagues that are more highly compensated.

Plaintiff held a role equal to or higher than the more highly compensated comparators asserted. Therefore, Plaintiff has shown a facially probable Equal Protection Act claim, as required to survive a Rule 12(b)(6) Motion to Dismiss.

### III.    PLAINTIFF PLAUSIBLY ALLEGES DEFAMATION

**A.    At the pleading stage, Plaintiff must allege publication, actionable words, and the requisite intent**

Under Virginia common law, the elements of defamation are: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 737 S.E.2d 890, 892 (2013); *Jordan v. Kollman,* 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). At the pleading stage, a plaintiff must identify the allegedly defamatory words with sufficient particularity, allege that they were communicated to at least one non-party person, and plead facts supporting a reasonable inference that the words were false, defamatory, and published with the applicable degree of fault. *See Fuste* v. *Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132–35 (2003) (Discussing pleading requirements). Rule 12(b)(6) does not require the plaintiff to authenticate

14

recordings, prove falsity, establish damages, or carry a clear-and-convincing evidentiary burden in the complaint.

Plaintiff's FAC not only meets this standard, it exceeds it. It alleges the speaker, the words, the occasions, the audiences, the professional context, the factual basis for falsity, and the resulting injury. Within hours of Plaintiff's termination, Wiltbank allegedly told an all-hands audience of ExistX and Galois personnel that the termination resulted from Plaintiff's "lack of trust" and her "IP handling." Amend. Compl. ¶¶ 290–296. On an April 17 recorded call with executives involved in business development, technical leadership, and government engagement, he allegedly stated that Plaintiff had "royally fucked up the response to 5STARS." *Id.* ¶¶ 297–302. The FAC also alleges a later publication to non-board employees and continued disparagement in the federal-contracting community. *Id*. ¶¶ 305–312, 356–361. It further identifies contemporaneous recordings, witness accounts, a signed memorandum, emails, text messages, and licensing records that allegedly contradict Defendants' narrative. *Id*. ¶¶ 178–201, 265–268, 294, 299–304. Those materials are evidence to be tested in discovery; their production is not a condition of pleading the claim.

**B.      The presence of hyperbolic language does not render a statement pure opinion if there is an underlying factual connotation.**

While pure statements of opinion are protected speech under Virginia law, any statement with a factual connotation, or that asserts a fact to support a stated opinion, is still an actionable statement for the purpose of a defamation claim. *See Tharpe*, 737 S.E.2d at 893 (explaining that only relative statements that are purely opinion, and therefore cannot be factually proven false, are protected speech); *Meredith v. Nestle Purina PetCare, Co.*, 516 F.Supp.3d 542, 548-549 (E.D.Va. 2021) (holding that a statement of opinion can remain actionable when there is an underlying factual connotation that may be proven false). Each of the statements made by Defendant Wiltbank

15

had underlying factual connotations concerning Plaintiff's performance and integrity. The connotations underlying Defendant's opinions can be factually disproven, both with the long record of Plaintiffs attempts to maintain the integrity of the company and her general efficacy in her position.

Additionally, when deciding whether a statement is actionable for the purpose of a defamation claim, the court must consider the social backdrop and context within which the statement was made. *Id.* at 549 ("[A] court evaluating whether a statement contains a provably false connotation — or instead represents a pure expression of opinion — must consider the broader social backdrop against which the defendant communicated the statement."); *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (2009). In *Government Micro Resources, Inc. v. Jackson*, the General Manager for the defendant company disparaged the performance of their prior CEO, blaming the plaintiff for a significant financial loss on a project and stating that he "mismanaged the company". 271 Va. 29, 36-37 (2006). This case is similar because just like in that case Defendant attempts to argue that Wiltbank's statement on the former CEO's performance was just an opinion. *Id.* at 40 (explaining that defendants use of hyperbolic language, specifically "exorbitant" and "mismanaged," does not render the factual connotations behind the opinion unactionable); *See also* Defs' Mem. at 10-11. However, the court held that potential financial loss and mismanagement as a part of a job performance is a factual connotation that can be proven false. *Id.* at 40-41. While mere hyperbole is protected speech, the presence of hyperbole alone is not sufficient to strip a statement of the factual connotations behind it.

The defamatory language alleged in this case involves conclusory language around Plaintiff's job performance and alleged consequences of said performance. Specifically, Defendant made the statement that Plaintiff "royally fucked up the response to 5STARS." *See* Amend. Compl.

16

¶ 356. Defendants assert that this statement is a quintessential opinion. However, despite the hyperbolic language in the statement, the underlying factual connotation is that Plaintiff mishandled a key project for the company. This can reasonably be proven false as a statement of fact through evidence of Plaintiff's performance in regard to that project, such as potential revenue or valuation increase surrounding her management or response. *See* Amend. Compl. ¶ 341. Additionally, the statement made by Defendants, asserting that "Plaintiff was 'grabby' and 'overreaching' with respect to IP," has the underlying factual connotation that Plaintiff mishandled Intellectual Property for the company. *Id.* at ¶ 356. These statements are neither pure opinions, nor mere hyperbole. These statements each have underlying factual connotations surrounding Plaintiff's performance as CEO that can be proven false with the facts asserted in the Complaint as to her efficacy within her position. *Id.* at ¶ 341.

**C.      A statement made between individuals with common interests is not automatically protected by qualified immunity if there is actual malice present.**

Defendants also claim that their statements are protected by qualified privilege, therefore shielding them from any and all resulting defamation claims. First, this assertion undermines any argument against Galois and ExistX being joint-employers because if Galois was truly not an employer of Plaintiff then they have no common interests in her employment status. Their blanket privilege theory also depends on an unresolved factual premise. They describe communications to employees of two different corporations as "solely internal" communications among Defendants and rely on authority involving employees, managers, and supervisors of a single company. Defs' Mem. 12-13. Then later Defendant's reverse track and claim the two entities are separate. Both things cannot be true at the same time. Defs' Mem. 18-19.

Under Virginia law, qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in

17

the subject of the communication. *Smalls v. Wright*, 241 Va. 52, 55 (1991). Any showing of malice or breach of good faith removes the statements made from the protection afforded by qualified privilege. *Id.*

While employment is an area where an absence of malice is assumed, Virginia law has set forth a non-exhaustive list of ways that a plaintiff can show a defendant has abused or lost qualified privilege. *See Larimore v. Blaylock*, 259 Va. 568, 574-575 (2000) (holding that discussing termination with an employee not traditionally involved in a termination decision was outside of the protections of qualified privilege, despite the presumed absence of malice). The list includes when (1) the statements were made with knowledge that they were false or with reckless disregard for their truth; (2) the statements were communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will; (4) the statements included strong or violent language disproportionate to the occasion; or (5) the statements were not made in good faith. *See Cashion v. Smith*, 286 Va. 327, 339 (2013)(holding that if any one of the elements is proved then the privilege is defeated).

Virginia law asserts that a finding of whether a defendant has lost qualified privilege is a matter for a jury, but a plaintiff that sets forth a sufficient allegation of malice, such as a showing of a general pattern of retaliation, can survive a Motion to Dismiss. *See Echtenkamp v. Loudon County Pub. Schools,* 263 F.Supp.2d 1043, 1062 (E.D.Va.2003)(holding that alleging a larger, general pattern of retaliation against the plaintiff is sufficient to survive a Motion to Dismiss); *Verrinder v. Rite Aid Corp.*, No. CIVA 3:06CV00024, 2006 WL 2222675  at *4 (W.D.Va. 2006)(holding that at an early stage of proceedings, such as a Motion to Dismiss, only a sufficient allegation of malice is required against a defendant with qualified privilege).

18

In this case, Plaintiff's Complaint clearly shows a larger pattern of consistent and targeted retaliatory conduct by Defendants. Following Plaintiff's opposition to Defendants' attempts to make unlawful or noncompliant representations to the federal government, she was subject to a campaign of retaliation, ultimately leading to her removal, about which Defendants' defamatory statements were made. *See* Amend. Compl. ¶¶ 315-320. Plaintiff alleges more than a bare allegation of malice, but places Defendants' statements in context with a general pattern of retaliation and an attempt to discredit Plaintiff following her wrongful termination. *Id*. at ¶¶ 356-358. This alone allows Plaintiff's defamation claims to survive a Motion to Dismiss, in spite of qualified privilege, under Virginia law. *See Echtenkamp*, 263 F.Supp.2d at 1062.

However, Defendants' defamatory statements were also made to others within the larger professional community, outside of those solely within Exist X or directly involved in termination decisions. *See* Amend. Compl. ¶¶ 357, 359. As discussed above, defamatory statements made to third-parties is one of the elements that, if shown in the Complaint, shows that a defendant has abused or lost their qualified privilege. *See Cashion*, 286 Va. at 339 (2013). Defendants' statements concerning Plaintiffs performance and alleged reasoning behind her termination would only be covered by qualified immunity if they were made to those directly involved in Plaintiff's termination, or an individual with a substantial interest in her termination. *Larimore*, 259 Va. at 574-575. However, Defendant was not so discerning in who he made the defamatory statements to as described in the FAC, and therefore should not enjoy the qualified privilege asserted in Defendants' Motion to Dismiss.

**IV.    COUNT VI PLAUSIBLY STATES A *BOWMAN* CLAIM FOR WRONGFUL DISCHARGE IN VIOLATION OF VIRGINIA PUBLIC POLICY.**

Plaintiff has plausibly stated a *Bowman* claim (Count VI) for wrongful termination based on violation of Virginia public policy that is supported by a Virginia state statute. Virginia adheres

19

to a strong presumption that employment is at-will, but recognizes a narrow exception ("*Bowman* claims") where an at-will employee is terminated in violation of public policy. *See Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 330 (1994); *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (1985). The Supreme Court of Virginia has recognized three situations in which a litigant may show her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy" and (3) "where the discharge was based on the employee's refusal to engage in a criminal act." *See Rowan v. Tractor Supply Co.*, 263 Va. 209, 559 S.E.2d 709, 711 (2002).

**A.     The FAC Identifies an Express Virginia Policy and Plausibly Alleges the Required Nexus**

Plaintiff qualifies for this exception under the second prong where public policy is violated. Under Virginia law, a *Bowman* claim for wrongful termination from employment based on violation of Virginia public policy must find root in a state statute. *See Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 809 (1996). The Virginia public policy implicated here is the Commonwealth's policy favoring honesty, fairness, impartiality, and avoidance of impropriety in public procurement, which is rooted and expressed in the Virginia Public Procurement Act, Va. Code § 2.2-4300 et seq. ("VPPA"). *See* Amend. Compl. ¶ 365. Plaintiff was terminated because she tried to keep Defendants in line with this Policy and was punished against public policy for her honesty.

Plaintiff satisfies the required elements of a *Bowman* claim. First, that policy is explicitly expressed in the VPPA statute "that all procurement procedures be conducted in a fair and impartial

20

manner with avoidance of any impropriety or appearance of impropriety. . . " and " . . . that procurement procedures involve openness." Va. Code § 2.2-4300. The FAC plausibly alleges the connection between that policy and Plaintiff's employment. Plaintiff alleges that, as ExistX's CEO and the executive responsible for compliance, security, and government-facing contracting, she was charged with preventing false, misleading, or improper representations concerning ExistX's rights to technology included in procurement submissions. Amend. Compl. ¶ 366. She further alleges that she refused to authorize or conceal proposals representing that ExistX possessed rights to use 5STARS without an executed license; repeatedly advised the Board and Wiltbank of the procurement-integrity consequences; convened an emergency Board meeting; and was terminated after she refused to proceed. *Id*. ¶¶ 367–371. At the pleading stage, those allegations plausibly place Plaintiff within the class of corporate officials whose conduct implements the procurement-integrity policy and plausibly connect her discharge to her performance of that responsibility. Defendants may contest that statutory nexus after factual development, but they cannot obtain dismissal by disregarding the duties and sequence alleged in the FAC.

Second, Plaintiff is clearly a member of the class of persons directly entitled to protection by this public policy. Her various positions held at ExistX carried the responsibilities and duties of "ensuring that ExistX did not make false, misleading, or improper representations in connection with government procurement activity." *See* Amend. Compl. ¶ 366. These facts sufficiently prove the link between her duties as an employee of ExistX, the public policy enunciated by the VPPA, and her wrongful termination. At the pleading stage, those allegations plausibly place Plaintiff within the class of corporate officials whose conduct implements the procurement-integrity policy and plausibly connect her discharge to her performance of that responsibility. Defendants may

21

contest that statutory nexus after factual development, but they cannot obtain dismissal by disregarding the duties and sequence alleged in the FAC.

**B. The absence of a reported decision applying § 2.2-4300 to *Bowman* establishes novelty, not a categorical bar.**

Defendants' principal premise is that "no court has ever held" that the VPPA can support a *Bowman* claim. Defs.' Mem. 14. The fact that the VPPA has not yet supported a *Bowman* claim does not preclude Plaintiff's opportunity to support her claim with it. Like the analysis that "judicial precedent is not always necessary to clearly establish a statutory right", the absence of a judicial decision on a particular statute or law does not preclude another Plaintiff from succeeding on their claim. *See McDaniel v. Arnold*, 898 F. Supp. 2d 809, 833 (D. Md. 2012). Defendants cite no Virginia appellate decision, Fourth Circuit decision, or decision from this Court holding that § 2.2-4300 is categorically unavailable as a source of *Bowman* public policy. The absence of a reported decision approving this precise statutory source is not negative precedent barring it. The Court must instead examine the statutory text, the class and interests the policy protects, and the pleaded relationship between that policy and the discharge.

Defendants support their argument with *Mirshahi v. Patient First Richmond Medical Group, LLC*, a Fourth Circuit decision concerning a *Bowman* claim supported by a different statute. *See* No. 25-1720, 2026 WL 1480914, at *2 (4th Cir. May 27, 2026). However, that decision merely reiterates that *Bowman* claims are limited exceptions to Virginia's public policy in favor of at-will employment. *Id.* It does not hold that the VPPA cannot serve as the basis for a Bowman claim, nor does it foreclose the use of the VPPA as a source of public policy. *Id.* Plaintiff is in an especially relevant situation for the use of the VPPA because her claim directly concerns wrongful

22

termination due to enforcement accountability and transparency with public procurement. *See* Amend. Compl. ¶¶ 366, 370.

Defendants next argue that Plaintiff is precluded from the *Bowman* claim as a remedy because she has similar conduct to support both the False Claims Act ("FCA") and the *Bowman* claim, and because there is an exclusive remedy under the VPPA. This argument clearly falls short. First, it is common practice for plaintiffs to plead multiple causes of action arising from the same nucleus of operative facts. The fact that certain conduct may support both a statutory claim and a common-law wrongful discharge claim does not render either claim defective. Second, the VPPA does not provide a remedy to Plaintiff for wrongful discharge.

The *Bowman* claim serves a distinct function by providing relief for Plaintiff, whose wrongful discharge may not be fully redressed through the remedies available under other statutes. *See* Amend. Compl. ¶¶ 372-373. The remedies available under the VPPA are limited to specific situations arising in government procurement offers, bids, and contracts. *See* Va. Code §§ 2.2-4357-4366.

Contrary to Defendants' baseless assertion, the fact that remedies may be available to Plaintiff under a different statute, the FCA, do not warrant the dismissal of her *Bowman* Claim. Unlike the statute used in *Hice v. Mazzella Lifting Techs., Inc.*, which "prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act", the VPPA does not contain an expansive remedial purpose for individuals facing wrongful termination in connection to enforcing the VPPA standards. *See* 589 F. Supp. 3d 539, 553 (2022); §§ 2.2-4357-4366.

Defendants' argument relies on precedent followed in *Hice*, where the court reasoned: ". . the existence of an extensive statutory scheme disqualifies the underlying policy from also

23

supporting a *Bowman* claim." *Id.* at 553. It is pivotal to include the further reasoning followed by this opinion and other similarly situated *Bowman* claims, that this preclusion is relevant only when the statute creates the cause of action and provides an expansive remedial scheme, so much so that seeking a different remedy would "enable a plaintiff to circumvent extensive remedial schemes crafted by the Virginia General Assembly, thereby rendering them a nullity". *See Carmack v. Virginia*, 2019 U.S. Dist. LEXIS 58816, at *13-14 (2019). Plaintiff's *Bowman* claim is clearly distinct from these precedents, because the VPPA does not provide extensive remedial schemes applicable to her. *See* § 2.2-4357-4366.

Lastly, Defendants attempt to justify the dismissal of Plaintiff's *Bowman* claim due to the citation of the VPPA without specifying certain subsections. This meritless argument is easily defeated by 4th Circuit Jurisprudence of what is required for a complaint to survive a motion to dismiss. In *Weidman*, the Fourth Circuit rejected the argument that a plaintiff's failure to cite a specific statute in support of his *Bowman* claim in the complaint warranted dismissal and held that "any deficiency in this regard is merely technical". *See Weidman v. Exxon Mobil Corp.*, 776 F.3d 214 at 221-222. As such, this Court should deny Defendants' Motion to Dismiss Plaintiff's *Bowman* claim (Count VI).

**V. PLAINTIFF DOES NOT OPPOSE DISMISSAL OF COUNTS I, II, VII, VIII, AND IX SOLELY AS TO WILTBANK IN HIS INDIVIDUAL CAPACITY.**

**A.      Dismissal of Claims I, II, VII, VII and IX as to Defendant Wiltbank.**

Defendants construe every count as asserted against every defendant and seek dismissal of the FCA, Virginia Whistleblower Protection Act, and Title VII counts against Wiltbank individually. Defs.' Mem. 16–22. To narrow the issues and avoid an unnecessary dispute over individual-capacity liability, Plaintiff does not oppose that limited relief. This clarification is limited. It does not dismiss or narrow Counts I, II, VII, VIII, or IX against ExistX or Galois.

Additionally, Plaintiff will continue to rely on Wiltbank's acts, statements, knowledge, recommendations, and compensation decisions as the conduct and knowledge of the corporate defendants. Plaintiff does not concede any issue concerning joint-employer, agency, or integrated-enterprise liability. Plaintiff's concession does not affect Count IV, concerning the Breach of Contract, Count V, which alleges Wiltbank's own defamatory publications, or Count VI to the extent Virginia law permits liability against the individual actor who violated public policy and participated in the discharge. *See VanBuren v. Grubb*, 284 Va. 584, 592, (2012).

**B.  Plaintiff Has Plausibly Stated a Breach of Contract Claim as to Defendant Wiltbank.**

Defendants argue that Defendant Wiltbank is not the proper defendant for the Breach of Contract claim (Count VI) because he was not a party to the alleged contract. Defendant Wiltbank was clearly a party to the alleged employment contract offered and signed by Plaintiff. *See* Amend. Compl. ¶ 39. His signature to the contract represents his assent to the agreement and sufficiently establishes that he is a party to the contract. *Id.*; *T.G. Slater & Son v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 842 (2004). Virginia law does not support dismissal on the pleadings where, as here, Plaintiff alleges both (i) personal participation by an individual in negotiating and breaching the contract, and (ii) facts supporting veil-piercing or alter-ego theories that could ultimately render that individual liable for the entity's contractual obligations.

Under Virginia law, a breach-of-contract claim requires: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004). The FAC alleges that ExistX tendered a formal offer of employment on or about September 11, 2023, which set forth specific terms, including base salary, an annual performance-based bonus of up to $50,000 in 2024 and $100,000 in subsequent years, and 700,000

25

shares of ExistX stock subject to milestones. Amend. Compl. ¶¶ 8, 35. Plaintiff accepted that offer and began performing as CEO; the offer letter "was also signed by the company's Chairman, Robert Wiltbank," and the Complaint alleges that it "constitutes a valid and binding employment contract." *Id*. ¶¶ 38-41. Defendants breached that contract by, among other things, paying only a $30,000 bonus for 2024 despite Plaintiff "meet[ing] or exceed[ing] all performance goals" and by depriving her of equity and other benefits promised in the letter. *Id*. ¶¶ 342-345.

Defendants assert that even if there was a contract, only ExistX can be liable because Wiltbank signed in a purely representative capacity. At this stage, that goes too far. Plaintiff alleges that Wiltbank personally negotiated, represented, and then undermined the core compensation terms; she further alleges that he used his control over both ExistX and Galois to cause and benefit from the breach. Amend. Compl. ¶¶ 5,10-11, 35, 39, 79, 83, 90-97, 120-40.

Virginia recognizes the veil piercing doctrine that permits personal liability in such circumstances under an alter-ego veil piercing concept. The Supreme Court of Virginia has long held that the corporate veil may be pierced where there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and adherence to the corporate fiction would promote injustice or fraud. *See Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (1987); *C.F. Tr., Inc. v. First Flight L.P.*, 580 S.E.2d 806, 809 (2003); and *Dana v. 313 Freemason*, 587 S.E.2d 548, 552 (2003). The Courts have also said that piercing is appropriate where the corporation is used "to evade personal obligations, gain personal tax advantages, and failed to take responsibility for corporate activities". *O'Hazza v. Exec. Credit Corp.*, 431 S.E.2d 318, 320 (1993).

Here, Plaintiff alleges classic alter-ego facts, including that Wiltbank simultaneously served as CEO of Galois and Chairman of the ExistX board, exercising ultimate authority over

26

both entities at all relevant times. Amend. Compl. ¶¶ 5,10-11, 35, 39, 79, 83, 90-97, 120-40. Payroll, HR, financial, and legal functions for ExistX were effectively controlled by Galois personnel, with overlapping officers and counsel and little meaningful separation. *Id*. Board-level decisions regarding her compensation, equity, and termination were made by individuals serving dual roles in both entities, with Wiltbank at the center. *Id*. Wiltbank used this structure to deprive Plaintiff of her contractual compensation and equity for the benefit of Galois and himself, while shielding behind ExistX's formal corporate identity. *Id*.

Taken as true, these allegations plausibly support a veil-piercing theory under Virginia case law. Allowing Defendant Wiltbank to be dismissed at this stage would violate the spirit of the law, particularly considering the allegations of his direct participation in the wrongful conduct. Whether Plaintiff can ultimately meet Virginia's demanding standard is a question for summary judgment or trial, not a basis for a Rule 12(b)(6) dismissal.

## CONCLUSION

For the foregoing reasons, the Court should DENY the motion in full. Alternatively, to the extent the Court finds any pleading deficiency, Plaintiff respectfully requests leave to amend the complaint pursuant to Rule 15 of the Federal Rule of Civil Procedure.

Respectfully submitted,

_/s/ Thomas J. Curcio_____
Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

Pamela M. Keith (Pro Hac Vice)
Raymond K. Gordineer Jr. (Pro Hac Vice)
CENTER FOR EMPLOYMENT JUSTICE

27

650 Massachusetts Ave. NW Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
pamkeith@centerforemploymentjustice.com
raygordineer@centerforemploymentjustice.com

***Attorneys for Plaintiff***

28

## CERTIFICATE OF SERVICE

This is to certify that on this 21st day of July 2026, a true copy of the foregoing Plaintiff's

Memorandum In Opposition To Defendants' Rule 12(B)(6) Partial Motion To Dismiss thereof were

served via electronic court filing on counsel of record:


Amy M. Pocklington (VA Bar No. 45233)
amy.pocklington@ogletreedeakins.com
Sebastian L. Brana (VA Bar No. 95703)
sebastian.brana@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
901 East Byrd Street, Suite 1300
Richmond, VA 23219
Tel.: (804) 663-2330
Fax: (804) 225-8641
*Counsel for Defendants*


*/s/ Thomas J. Curcio*
*Counsel for Plaintiff*

29